MARY E. LEARY *vs.* WILLIAM G. WEBBER COMPANY.

Essex.  November 2, 1910. — October 17, 1911.

Present: RUGG, C. J., HAMMOND, LORING, & SHELDON, JJ.

*Negligence, Volenti non fit injuria,* Employer's liability.  *Evidence,* Presumptions and burden of proof.

Where, in an action of tort for personal injuries, a defendant, who is shown to have been at fault, sets up the defense of *volenti non fit injuria,* alleging that the plaintiff, knowing of the danger to which his injury was due, voluntarily incurred the risk, this is an affirmative defense, which must be pleaded as such by the defendant, and the burden of proving it is on him.

In an action against the proprietor of a department store by the head fitter in the defendant's cloak and dressmaking department, who had been in the defendant's employ for fifteen or sixteen years, for personal injuries, alleged to have been caused by the defendant's negligence in employing an incompetent person to operate a passenger elevator in the defendant's building, it appeared that the injuries were sustained from the plaintiff being thrown into the elevator well by the starting of the elevator when she was about to enter it and had put

one foot upon it. There was evidence warranting a finding that the servant of the defendant in charge of the elevator was half-witted and childish, that he did not have the mental capacity to run an elevator and that he did not run this elevator properly during the six or seven weeks that he was employed to do so, and there also was evidence warranting a finding that if the defendant had exercised due care he would have known these facts, and consequently that the defendant was negligent in continuing the servant in his employ in charge of the elevator. The plaintiff testified on cross-examination that she had noticed the symptoms of mental deficiency in the elevator boy, that she had ridden with him thirty times in a business day, about one hundred and eighty times a week, and during that time had noticed that the boy could not control the elevator very well and that he could not stop and start it properly, that she had seen him start the elevator improperly by starting it when he ought not to and by starting it before fully closing the door. When asked, on cross-examination, whether she did not know that if the elevator went up without the door being wholly closed there would be nothing to prevent a person on the floor from falling into the well, she answered, " Yes, sir; I knew it, but I didn't think of it in that way," and testified further that " if the boy did not start the elevator properly at the floors there was a chance that somebody would be hurt by falling," and that " there was a probability that owing to this boy not handling the elevator right an accident would be liable to happen . . . to those who were riding with him." The defendant contended that the principle of *volenti non fit injuria* applied, and that the defendant as matter of law could not be held liable because the plaintiff, knowing of the danger, voluntarily incurred the risk of such an accident as happened. *Held,* that it could not be ruled as matter of law that the defendant had made out the affirmative defense of *volenti non fit injuria,* because there was evidence warranting a finding that the plaintiff, although she knew of the incompetence of the elevator boy, did not wholly appreciate the danger arising from it.

TORT, against a corporation maintaining a department store in Salem, by the head fitter in the defendant's cloak and dressmaking department, for personal injuries sustained on March 30, 1906, in the course of the plaintiff's employment by the defendant, alleged to have been caused by the negligence of the defendant in employing for the management and operation of a passenger elevator in its building an incompetent person of insufficient mental and physical capacity and skill. Writ dated September 14, 1906.

The answer consisted only of a general denial.

In the Superior Court the case was tried before *Morton,* J. The material evidence is described in the opinion. At the close of the plaintiff's evidence, the judge, in accordance with an agreement of the parties, ordered a verdict for the defendant and reported the case for determination by this court, with the stipulation that, if upon all the competent evidence reported the

plaintiff was entitled to go to the jury, judgment should be entered for the plaintiff in the sum of $2,500; otherwise, that judgment should be entered for the defendant.

*J. P. Sweeney,* for the plaintiff.

*R. Spring,* (*G. E. Kimball* with him,) for the defendant.

LORING, J.  The plaintiff's story in this case was that she had come down on the elevator from the top to the first floor to get a piece of satin.  After getting it she returned to go up in the same way and found "the elevator was up."  She rang the bell and Kinsman came down with some matting in the elevator. She waited while he took it off, and then (to quote her own words) "I went to get on the elevator and as I put my right foot on the elevator, and before I had a chance to put the left foot on the elevator, it shot up. . . . The next thing I remember [was] hanging on to something; it seemed to me [to be] the bar under the elevator."  She testified that she hung on until she got nearly to the second floor, when she let go and fell to the bottom of the elevator pit some three feet below the basement floor.

The accident happened on March 30, 1906.  Kinsman testified that he was employed to run the elevator on February 2 of the same year, six weeks and four days before the accident.  He was then "about twenty-three years of age," and "left school in June, 1902," when he "was about eighteen," having gone through the grammar school.  He testified that he worked in a grocery and bakery for six months, then for a grocer "about a year;" that then he was in the grocery business for himself for a year and a month, then "filled in a vacation time" for two months, then worked for grocers a year and a half, then for the United Shoe Machinery Company for three months, and then for the defendant.  He never had run an elevator before and was employed by the defendant at $5 a week to run the elevator in question.

The plaintiff was the head fitter in the defendant's establishment and had been in their employ for fifteen or sixteen years. She testified that Kinsman "didn't seem to have the control of the elevator that the other boys had, but he seemed to be slower in his movements. . . . When you spoke to him he didn't seem to grasp the meaning of what you said, and then he had rather

a sort of flippant way of answering and stupid way of looking at you, and very often he would laugh when there wasn't anything to laugh at," and that she noticed this right away after he came to work. On being asked what she had noticed in respect to his laughing she testified " Well, for instance, I would say to him, tell Mr. Palmer or tell somebody else something on that floor in regard to a suit and he would look at me and laugh instead of starting and doing it, instead of making some answer he would laugh and many times wouldn't do it." On cross-examination she testified that she rode with Kinsman thirty times a business day, about one hundred and eighty times a week, and during the time that Kinsman was there she had noticed " that he could not control the car, as you [she] thought, very well, . . . that he could not stop and start it properly," and " when you [she] say [says] he didn't run it properly, that was because he didn't seem to have control of it; " that she " had seen him start it and stop it improperly," and " by starting it improperly you [she] mean [meant] start it when he ought not to ; " that she had " seen him start the elevator before he would fully close the door." She further testified on cross-examination that she had " been perfectly familiar with elevators for many years, in the sense of riding on them," and " with that elevator ; " that she knew that elevators move rapidly and are controlled by a lever; that people enter them through folding doors; that when the door is open that that leaves a space into which one can fall into the well; that she had seen Kinsman start the elevator before he closed the door wholly. In answer to the question " And you knew that if the elevator went up without the door being wholly closed there would be nothing to prevent a person on the floor from falling down the well," she answered, " Yes, sir; I knew it, but I.didn't think of it in that way." She further testified that she did know it, and again, in answer to that question she testified that " if the boy did not start the elevator properly at the floors there was a chance that somebody would be hurt by falling; " and that " there was a probability that owing to this boy not handling the elevator right, an accident would be liable to happen," and " happen to those who were riding with him." On re-direct examination the plaintiff testified that she had ridden on the elevator when

members of the "firm" were on it, and once she heard one of the "partners" "reprimand the boy about bringing the elevator even with the floor," and in "one instance he told the boy if he was not careful he would have an accident." On re-cross-examination she testified that she had "seen him [Kinsman] quite a few times reprimanded."

There was corrobation of the plaintiff's testimony as to Kinsman's incompetency. One of the defendant's employees testified that she noticed something about Kinsman that struck her as peculiar and unusual; "he didn't talk as other people would talk. . . . He would talk about things that I didn't understand what he was talking about. He was laughing all the time. He would laugh at things anybody else wouldn't laugh at. . . . I have often seen him going up on the elevator and I would be on the elevator with him and he would be waving his hand to all the girls, some of the girls in the store and sometimes hollering out their names and laughing; and often times telling things that I wouldn't understand what he would be talking about; couldn't understand him; they would have no meaning to them — his words." Another employee testified that "there was something in his manner that struck me as unusual and peculiar, . . . such as laughing and talking foolishly." In answer to the question "What was there to laugh at at the time that he laughed," she testified: "There wasn't anything that I thought was. . . . He seemed frivolous talking. . . . There didn't seem to be any sense to his conversation." After testifying that he stopped and opened the elevator door before getting level with the floor and that he often would start up before closing it, she was asked, "How far up would he go before he closed the door," and she answered, "Well, perhaps sometimes that far (indicating about two feet)," and that she observed that "quite a number of times." On cross-examination this witness testified: "The boy's talk was frivolous. My objection was not to the boy's talking at all, but that there didn't seem to be any sense to what he said."

Another employee testified that from his observation of Kinsman "he wasn't quick enough, couldn't think quick enough, . . . not quick enough for that place." Another, that "he used to make faces at the girls in the cashier's desk."

There was abundant evidence that by general reputation Kinsman was incompetent. If some of this evidence came within *Driscoll* v. *Fall River*, 163 Mass. 105, there was much that did not.

At the defendant's request the presiding judge, following the decision in *Hatt* v. *Nay*, 144 Mass. 186, refused to allow the plaintiff to introduce in evidence specific instances of negligence, and struck out some evidence of that kind which had been admitted. The learned counsel for the defendant insisted that the plaintiff's witnesses should not give their opinions or testify to what they thought about Kinsman, and the presiding judge upheld him in this. The familiar rule which permitted the witnesses to state as matter of observation what they saw about Kinsman that was peculiar or unusual (see *Clark* v. *Clark*, 168 Mass. 523; *McCoy* v. *Jordan*, 184 Mass. 575; *Gorham* v. *Moor*, 197 Mass. 522; *Jenkins* v. *Weston*, 200 Mass. 488), was explained and acted upon by the presiding judge.

This evidence warranted a finding that Kinsman was half-witted and childish in general; and that in the particular here in question he did not have enough brains to run an elevator; that in fact he did not run the defendant's elevator properly during the six to seven weeks in which he undertook to do so. The further finding was warranted that if the defendant had exercised due care it would have known this. It is possible that the jury might have taken a different view of the evidence. But it was at least possible for the jury to find that Kinsman, in regard to the duties he was employed to perform, was an incompetent servant; that the defendant ought to have known of it and consequently was negligent in continuing him in its employ; and that this negligence was the cause of the injury to the plaintiff. *Cayzer* v. *Taylor*, 10 Gray, 274. *Gilman* v. *Eastern Railroad*, 10 Allen, 233; *S. C.* 13 Allen, 433.

The defense set up is the defense of *volenti non fit injuria.* Where a defendant otherwise liable for an injury sets up the doctrine of that maxim, he is setting up an affirmative defense which must be pleaded by him as such, and the burden of proving it is on him.

The question we have to decide is whether on the evidence in this case the jury should have been instructed that the defendant

as matter of law had made out this affirmative defense.   There are cases where facts are disclosed by the plaintiff's evidence (introduced to prove his own case) which as matter of law prove an affirmative defense pleaded by the defendant.   But such an instance is the exception.   The general rule is that it is for the jury to decide whether as matter of fact an affirmative defense has been made out in the evidence.   This always must be so where the evidence which is relied on to make out the affirmative defense is introduced by the defendant.   For in that case the plaintiff can ask the jury to disbelieve the facts testified to by the defendant's witnesses without introducing any evidence to contradict them.   *Lindenbaum* v. *New York, New Haven, & Hartford Railroad,* 197 Mass. 314.

In our opinion this case comes within the decision made in *Fitzgerald* v. *Connecticut River Paper Co.* 155 Mass. 155.   That case was decided on the ground that the evidence in that case warranted a finding that the plaintiff did not wholly appreciate the risk and for that reason this affirmative defense was not made out as matter of law.   There are subsequent cases which have been decided on the same ground.   See *Cooney* v. *Commonwealth Avenue Street Railway,* 196 Mass. 11; *Baldwin* v. *American Writing Paper Co.* 196 Mass. 402; *Herlihy* v. *Little,* 200 Mass. 284.   We are of opinion that within the decisions in these cases the jury would have been warranted in finding in the case at bar that the plaintiff did not wholly appreciate the risk of Kinsman's incompetence and therefore that the affirmative defense had not been made out as matter of law.

In accordance with the terms of the report the entry must be
*Judgment for the plaintiff in the sum of $2,500.*