## NATIONAL BANK OF THE REPUBLIC v. PRICE.

No. 3296.  Decided Nov. 19, 1923.  Rehearing denied Dec. 31, 1924.
    Second Rehearing denied March 6, 1925.   (234 P. 231.)

1.  BILLS AND NOTES—SIGNING NAME ON BACK OF NOTE, GUARANTEE-
    ING PAYMENT, WAIVING PROTEST, DEMAND, AND NOTICE HELD IN-
    DORSEMENT WITH ENLARGED LIABILITY.  Signing name on back
    of note, guaranteeing payment thereof, and waiving protest,
    demand, and notice of nonpayment, is indorsement with en-
    larged liability.

2.  BILLS AND NOTES—EXCLUSION OF EVIDENCE THAT CONDITIONS ON
    WHICH STOCK SUBSCRIPTION NOTE WAS DELIVERED HAD NOT BEEN
    COMPLIED WITH HELD ERROR.  In action on note for stock in
    sugar company, delivered under agreement that it should be
    held in trust until 3,000 acres of beets had been contracted to
    be grown, held that it was substantial error to exclude evidence
    that, if sales by salesmen not licensed under Blue Sky Law
    were excluded, less than required acreage contracts had been
    secured, making contract void.

3.  LICENSES—"INVESTMENT COMPANY" WITHIN STATUTE REQUIRING
    LICENSE TO SELL STOCK DEFINED.  "Investment company," re-
    quired to be licensed to sell securities under Blue Sky Law,
    §§ 3, 4, is one that sells its own stock and does not engage
    in business of stock selling as a dealer, in view of section 18.[1]

---

[1] *Guaranty Mortgage Co.* v. *Wilcox*, 62 Utah, 184, 218 P. 133, 30 A. L. R. 1324.

4. CORPORATIONS—CREATION OF CORPORATION PURELY STATUTORY. Corporation is mere creature of law, and cannot be created except by statute.

5. LICENSES—CORPORATION, ORGANIZED TO RAISE SUGAR BEETS AND MANUFACTURE SUGAR, HELD NOT EXEMPT FROM BLUE SKY LAW BECAUSE STOCKHOLDERS WERE REQUIRED TO RAISE BEETS. Corporation, organized to grow sugar beets and manufacture sugar, in which no one could be stockholder unless he agreed to raise beets, was not exempt from Blue Sky Law, and had no right to sell stock except by authority of Securities Commission.

6. LICENSES—THAT SUBSCRIPTION TO STOCK WERE RESTRICTED TO BEET GROWERS HELD NOT TO PREVENT TRANSACTIONS FROM BEING "SALES OF STOCK" WITHIN BLUE SKY LAW. That subscriptions to stock in corporation were restricted to sugar beet growers as part of general plan for raising beets and manufacturing sugar *held* not to prevent transactions from being "sales of stock," required to be licensed under Blue Sky Law.

7. LICENSES—ILLEGALITY OF PORTION OF INDIVISIBLE SUBSCRIPTION CONTRACT UNDER BLUE SKY LAW TAINTED WHOLE TRANSACTION AND NOTE GIVEN THEREUNDER WAS VOID. Where contract whereby farmers agreed to raise sugar beets for corporation in which they at same time agreed to subscribe stock was indivisible, illegality of portion thereof under Blue Sky Law tainted whole transaction, and stock subscription note thereunder was void.

8. BILLS AND NOTES—STOCK SUBSCRIPTION NOTE VOID AS BETWEEN ORIGINAL PARTIES HELD NOT INVALID IN HANDS OF INNOCENT PURCHASER. Stock subscription note void as between original parties and as to persons charged with notice or not purchasing in good faith because transaction was illegal under Blue Sky Law would not be invalid in hands of innocent purchaser.[2]

9. CORPORATIONS—TRANSFER OF SUBSCRIPTION NOTES WITHOUT COMPLYING WITH CONDITIONS ON WHICH THEY WERE DELIVERED HELD FRAUDULENT BREACH OF FAITH. Where stock subscription notes were delivered under agreement that they should be held in trust until 3,000 acres of sugar beets had been contracted to be grown, transfer of notes without having secured contracts for required acreage was fraudulent breach of faith.

10. BILLS AND NOTES—HOLDER HAS BURDEN OF PROVING GOOD FAITH AS WELL AS OF SHOWING THAT IT HAD NO KNOWLEDGE OF DEFECT-

[2] *First Nat. Bank* v. *Parker*, 57 Utah, 290, 194 P. 661, 12 A. L. R. 1373.

IVE TITLE OF TRANSFEROR. Holder of note has burden of proving his good faith as well as of showing that it had no knowledge that title of person from whom it received it was defective, but it is not required to show good faith of such person.

11. BILLS AND NOTES—WHETHER HOLDER OF STOCK SUBSCRIPTION NOTE TOOK IT IN GOOD FAITH, UNDER EVIDENCE, HELD QUESTION OF FACT FOR JURY. Whether holder of stcok subscription note took it in good faith, under evidence, *held* question of fact for jury.[3]

12. BILLS AND NOTES—PAYMENT OF VALUE RAISES PRESUMPTION OF GOOD FAITH; THAT HOLDER DID NOT GIVE FULL VALUE FOR NOTE SHOULD BE CONSIDERED ON ISSUE OF GOOD FAITH. Proof that holder paid full value for note raises presumption of good faith, and fact that holder did not give full value is one of circumstances to be considered by jury on issue of good faith.

13. BANKS AND BANKING—NATIONAL BANK CANNOT TRADE NEGOTIABLE PAPER HELD BY IT FOR OTHER PAPER. National bank has no right to deal in negotiable paper except in manner provided by law, which is limited to discounting such paper, and it cannot trade negotiable paper held by it for other paper.

On Application for Rehearing.

14. LICENSES—PROVISION OF BLUE SKY LAW EXCEPTING NOTES DUE WITHIN THREE YEARS HELD NOT APPLICABLE TO NOTES GIVEN TO CORPORATION FOR STOCK. Provision of Blue Sky Law that it shall not apply to commercial paper or negotiable notes due not more than three years from date applies only to notes sold by corporation, and does not apply to notes given to corporation for stock.

15. LICENSES—SUBSCRIPTION TO STOCK IN EXISTING CORPORATION IS "PURCHASE" OF STOCK WITHIN BLUE SKY LAW. Subscription

[3] *Leavitt* v. *Thurston*, 38 Utah, 351, 113 P. 77.

[4] *Guaranty Mortgage Co.* v. *Wilcox*, 62 Utah, 184, 218 P. 133, 30 A. L. R. 1324.

See (1) 8 C. J. pp. 354, 355; (2) 8 C. J. p. 1026; (3) 25 Cyc. p. 615 (1926 Anno); (4) 14 C. J. p. 92; (5) 25 Cyc. p. 615 (1926 Anno); (6) 25 Cyc. p. 615; (7) 25 Cyc. 615 (1926 Anno); (8) C. J. p. 773 (1926 Anno); (9) 14 C. J. p. 583 (1926 Anno); (10) 8 C. J. pp. 496, 983; (11) 8 C. J. p. 1062; (12) 8 C. J. p. 495, 509; (13) 7 C J. pp. 818, 819 (1926 Anno); (14) 25 Cyc. p. 615 (1926 Anno); (15) 25 Cyc. p. 615 (1926 Anno); (16) 7 C. J. p. 832; (17) 38 Cyc. pp. 1517, 1540.

to stock in corporation made after its incorporation is "purchase" of stock within Blue Sky Law, requiring license to sell stock.[4]

16. BANKS AND BANKING—GOVERNMENT ALONE CAN COMPLAIN THAT TRANSACTION BY NATIONAL BANK IS ULTRA VIRES. That transaction whereby national bank exchanged notes *held* by it for others is beyond its powers is no defense to maker of note traded to bank, but government alone can complain.

17. TRIAL—WHERE EVIDENCE IS SUCH THAT MEN OF ORDINARY INTELLIGENCE MIGHT DRAW DIFFERENT CONCLUSIONS THEREFROM, IT PRESENTS QUESTION FOR JURY. Where evidence is such that men of ordinary intelligence might draw different conclusions therefrom, it presents question for jury.

FRICK, J., dissenting in part.

Appeal from District Court, Third District, Salt Lake County; *L. B. Wight,* Judge.

Action by the National Bank of the Republic against H. Price. Judgment for plaintiff, and defendant appeals.

REVERSED, and new trial granted.

*Willey, Willey & Nelson,* of Salt Lake City, for appellant.

*Straup, Nibley & Leatherwood,* of Salt Lake City, for respondent.

WEBER, C. J.

The substance of the complaint is that on October 7, 1920, the defendant executed and delivered his promissory note in the sum of $140 to the Pioneer Sugar Company, a corporation, payable November 15, 1921; that on January 27, 1921, the Pioneer Sugar Company, in due course, for value, sold, assigned, and delivered the note to Ernest R. Woolley, and then indorsed the note as follows:

"For value received Pioneer Sugar Company guarantees the payment of the within note, waiving protest, demand and notice of nonpayment."

The note was signed "Pioneer Sugar Company, Joseph Smith, president, C. G. Patterson, secretary."

It is averred that on February 9, 1921, Woolley, then the lawful holder of the note, for value and in due course, sold and delivered it to the plaintiff, who ever since has been and at the commencement of the suit was the holder of the note in due course, and that no part of it has been paid.

To the complaint defendant interposed a general and also a special demurrer the latter upon the ground that it cannot be determined from the complaint "by what means plaintiff became the owner of said note; that is to say, whether said plaintiff became the lawful holder and owner of said note through negotiation by indorsement or by assignment, whether plaintiff is suing on said note as a holder in due course or as assignee." The demurrers were overruled.

In his answer, defendant denies that the note was negotiated by indorsement, denies that plaintiff is the lawful holder in due course, and pleads as an affirmative defense that the Pioneer Sugar Company was and is a corporation under the laws of Utah; that the note formed a part of one contract with the Pioneer Sugar Company; that stock in the Pioneer Sugar Company was purchased and the note was signed for the purpose of erecting a sugar factory in Salt Lake county; that by the terms of the contract aforesaid the note of defendant, with other similar notes and contracts, was to be placed in trust with Halloran-Judge Trust Company until 3,000 acres of beets had been contracted to be grown in the counties of Salt Lake, Utah, Davis, and Tooele, and $300,000 in stock subscriptions obtained, or until February 15, 1921, at which time the notes and contracts were to be returned to the farmers signing them, if the required acreage and stock subscription agreements had not been obtained. Failure of consideration is also pleaded in that the Pioneer Sugar Company failed to erect a sugar factory in Salt Lake county as agreed, and that the officers of the sugar company, without having procured either the 3,000 acres of beets to be grown or the $300,000 in stock subscriptions in the counties mentioned, fraudulently transferred the notes of numerous farmers, including that of

defendant, to Ernest R. Woolley for stock in the Interstate Sugar Factory; that said stock was without value and worthless. Further failure of consideration is pleaded, in that the contracts with many of the farmers, which contracts were a consideration for defendant's contract, were unlawful and void because not obtained by agents licensed as required by statute. It is also alleged that defendant never delivered the note to the Pioneer Sugar Company, and never authorized its delivery to said company. It is pleaded that by the terms of the contracts of the various farmers with the Pioneer Sugar Company, and with each other, the contracts were mutually dependent upon and formed a part of the consideration for every other contract, and that all contracts of the various farmers constituted one contract; that many of the agents of the Pioneer Sugar Company who secured stock subscription agreement forming part of this one contract were not licensed as the statute provides, and that all said contracts of stock sales and notes were unlawful and void. It is further alleged that plaintiff was not an innocent purchaser of defendant's note, but had knowledge and notice of the infirmities and defenses against the note, and that, if plaintiff did not have notice and knowledge of such infirmities and defenses, it was because plaintiff intentionally and willfully closed its eyes to the means of knowledge at hand.

Defendant in his answer declares himself able, ready, and willing to surrender to plaintiff all benefits, advantages, and property, if any such exist, to which he may be entitled by virtue of the Pioneer Sugar Company's having procured said note, and asks that the note be returned to him.

In its reply, plaintiff admits the corporate existence of the Pioneer Sugar Company, and that plaintiff holds a large number of notes made payable to the Pioneer Sugar Company and by it transferred to Ernest R. Woolley, who transferred them to plaintiff. All other allegations of defendant's affirmative answer are denied, and plaintiff affirmatively avers the execution and delivery of the note and the indorsement by the Pioneer Sugar Company.

After all the evidence was introduced, plaintiff moved for

a directed verdict in its favor, which was granted. From the judgment defendant appeals.

The exception to the instruction directing a verdict for plaintiff and the exception to the court's rulings overruling the demurrers constitute the principal assignments of the 140 specifications of error.

It is urged that because of the form of the indorsement on the back of the note by the Pioneer Sugar Company the complaint does not contain facts sufficient to constitute a cause of action.

When the note was transferred to Woolley, the writing, as signed by the Pioneer Sugar Company, through its officers, was, "for value received Pioneer Sugar Company guarantees the payment of the within note, waiving protest, demand, and notice of nonpayment." It is argued by counsel for appellant that that is not an indorsement, but merely a contract of guaranty, or merely an assignment, and, not being an indorsement, that the plaintiff took the note subject to all equities and defenses which defendant had to the note in the hands of the original payee.

We have no doubt that the writing on the back of the note constitutes an indorsement, with an enlarged liability. There is some conflict in the earlier cases, but in the cases based upon the Uniform Negotiable Instruments Law it is almost universally held, and the great weight of judicial opinion is, that signing a name upon the back of a note guaranteeing payment thereof, waiving demand, protest, and notice of protest, operates as a transfer of the note and as an indorsement thereof with enlarged liability. 8 C. J. p. 354; 21 A. L. R. 1382; *Cady* v. *Bay City Land Co.,* 102 Or. 5, 20 P. 179, 21 A. L. R. 1367; *Hendrix* v. *Bauhard,* 138 Ga. 473, 75 S. E. 588; *Voss* v. *Chamberlain,* 139 Iowa, 569, 117 N. W. 269, 19 L. R. A. (N. S.) 105, 130 Am. St. Rep. 331; *Durand* v. *Shaw,* 157 Mich. 192, 121 N. W. 809, 133 Am. St. Rep. 342; *Bank* v. *Cummings,* 69 Okl. 216, 171 P. 862, L. R. A. 1918D, 1099; *Hutson* v. *Rankin,* 36 Idaho, 169, 213 P. 345, 33 A. L. R. 91.

The demurrers were properly overruled.

The Pioneer Sugar Company was organized under the laws of this state on July 12, 1920. On July 19th application was, made to the Utah Securities Commission to sell "8 per cent. cumulative capital stock" for cash and negotiable paper, and the proceeds from the sales of securities were to be used to buy or build a beet sugar factory in Salt Lake county. A permit to sell stock was thereafter issued, and a stock-selling campaign was commenced among the farmers of Salt Lake, Davis, Utah and Tooele counties. A comprehensive plan had been evolved under certain agreements: First, there was the preliminary expense agreement. Next, the stock subscription agreement, signed by the defendant as well as all other stock purchasers, in which it was agreed, inter alia:

"That the purchaser hereby subscribes for seven shares of the capital stock of the company and, in payment therefor, gives his promissory notes in the total sum of $700.00, said notes being payable on or before November 15, 1921, November 15, 1922, November 15, 1923, November 15, 1924, and November 15, 1925, respectively, and the company accepts the said subscription and issues seven shares of its capital stock in the name of the purchaser.

"It is mutually agreed and understood by and between the parties hereto that the purchaser is to prepare for, plant, and deliver not less than seven acres of sugar beets to the company during each of the years 1921, 1922, 1923, 1924, and 1925; the company accepting said beets in accordance with the terms and conditions of that certain sugar beet contract made in duplicate by and between the parties hereto of the date of October 7, 1920.  *   *   *

"The terms and conditions of this contract are that the company will cause to be held in trust the said notes for the purchaser until 3,000 acres of beets are contracted to be grown for the company by the farmers of Salt Lake, Davis, Utah, and Tooele counties, and the sum of $300,000 in stock subscriptions is taken from the aforesaid farmers.

"In the event that the foregoing acreage and subscriptions are not secured by the close of the day of February 15, 1921, then this agreement is null and void, and the purchaser's notes shall be returned to him, and all agreements and contracts made between the purchaser and the company shall be canceled; otherwise to remain in full force and effect.

"Halloran-Judge Trust Company is hereby appointed trustee by the parties hereto, it being mutually agreed that this contract, the beet contract herein referred to, the notes and stock herein mentioned, shall be placed in the custody of the said trustee to be held

in trust, pending the fulfillment of the conditions herein stated, and that, upon the failure of the said conditions, the said trustee is to return the said notes to the purchaser, on demand, and upon the performance of the conditions the trustee is to deliver the stock to the purchaser, and the company will regain possession of the notes."

The so-called sugar beet contract, so far as material here, provided:

"That for the purpose of securing a sugar factory in Salt Lake county to be operated upon the co-operative principle and with the express understanding that this agreement is one of a series substantially identical in terms and intended to be circulated for subscription concurrently herewith in any or all of the counties of Salt Lake, Davis, Tooele, or Utah, and expressly agreeing that all such agreements shall be deemed as one contract for the purpose of binding all the respective subscribers hereto to aid and assist in the establishment of a co-operative sugar company in Salt Lake county, and in consideration of the mutual promises and obligations of the signers of the agreements herein designated, each of said signers undertaking to produce sugar beets under the terms and conditions imposed herein because of the personal benefit expected to be derived from sugar beet production under the co-operative plan, and which benefits cannot be realized without the support of all the signers, the grower agrees to grow in each of the years 1921, 1922, 1923, 1924, and 1925, from seed supplied under the directions of the company, not less than seven acres of sugar beets, to be grown on lands under the control of the grower that are best suited to beet production, and to sell and deliver the entire crop therefrom to the company, its successors or assigns, and the company, its successors or assigns, agrees to buy and pay for said sugar beets upon all and singular the terms and conditions herein set forth.

"The grower will prepare and cultivate the land and harvest the beets grown thereon in a husbandlike manner, and will deliver same properly topped in conformity with the rules and regulations prescribed by the farmers' association having charge of the matter, of which association the grower agrees to become a member, and to submit to the requirements of such association as made upon the members. *  *  *

"In the event that 3,000 acres of beets are not signed and stock subscriptions to the Pioneer Sugar Company, in the amount of not less than $300,000 are not secured in the counties herein mentioned before February 15, 1921, this agreement shall be null and void; otherwise to remain in full force and effect.

"This agreement shall bind the grower, his heirs, and personal

representatives, and shall not be transferable by him or them except to the purchaser of lands owned by the grower."

For the seven shares of Pioneer Sugar Company stock which the company agreed to deliver to defendant he executed his various ·notes totaling $700, including the $140 note upon which this suit is based.

No sugar factory was erected in Salt Lake county. The notes and contracts were never deposited with the trustee. Instead of complying with the terms of the contract, the Pioneer Sugar Company exchanged the notes of the farmers, including that of defendant, to Ernest R. Woolley for stock in the Interstate Sugar Company, a Utah corporation with a sugar factory in Weber county, and Woolley made an exchange with plaintiff by which it obtained defendant's note with others.

P. A. Williams was the managing or general agent of the Pioneer Sugar Company for the procurement of subscriptions and the sale of stock. He personally negotiated with defendant and obtained his subscription and promissory note given in payment for Pioneer Sugar Company stock. His application to the Securities Commission to sell preferred stock and bonds of the Pioneer Sugar Company was put in evidence, and it is argued therefrom that Williams did not receive a permit to sell stock of the Pioneer Sugar Company because it had no preferred stock and no bonds. The evidence, however, is conclusive, regardless of his application, that a proper permit was issued to Williams by the Securities Commission to sell stock of the Pioneer Sugar Company. If the Price contract and note stood alone, and were separate from and independent of the other contracts, and severable from the general plan or scheme, the question as to whether the transaction with the defendant was made void by the Securities Commission Law would be eliminated, but a number of the notes given by the different farmers for the stock were procured by agents who had not obtained a license or permit from the Securities Commission.

Heber C. Hicks, the secretary of the Commission, furnished a list of agents who were licensed by the Securities Commission, which list was admitted in evidence. It is stren-

uously insisted by respondent that this list was not admitted in evidence, but a careful examination of the record shows that counsel's statement is made inadvertently. Among the exhibits introduced by plaintiff was one that contains a list of salesmen, together with the amount of notes obtained and stock sold by each. An examination of this record in connection with the list of licensed agents furnished by the secretary of the Commission shows that the acreage secured by the licensed agents was less than 3,000 acres. Taking into consideration the subscriptions procured by both licensed and unlicensed agents, it appears from the evidence that notes in excess of $300,000 were procured, and that stock equal to that amount was sold prior to and including January 26, 1921, the date on which defendant's note and the notes of other farmers were transferred to Ernest R. Woolley, and that at that date about 3,068 acres of beet acreage had been secured. It is fairly inferable that of these 3,068 acres something over 90 acres were secured and notes obtained for stock in the sum of over $9,000 by unlicensed agents who operated illegally.

If this inference be questionable, the issue is still squarely raised by the ruling of the court denying defendant the right to introduce evidence tending to show that unlicensed agents of the company had procured part of the 3,000 beet acreage contracts together with part of the $300,000 in notes and the same amount of stock subscriptions or sales. Thus Mr. T. J. Evans, who had secured some 50 acres of the beet acreage with stock subscriptions and notes in connection therewith, was asked whether he had a license from the Securities Commission of the state to act as agent for the Pioneer Sugar Company or to obtain subscription agreements or sugar beet contracts, or to procure notes, at any time during the year 1921. This question was asked in various forms and objections to each sustained. If sales by unlicensed agents in amounts sufficient to leave less than the required 3,000 acres make void the entire contract of the sugar company with the various farmers to whom stock was sold and who had given their notes, it was a vital question that was asked of Mr. Evans, and the ruling of the court would clearly

be error that would affect the substance of the issue here involved.

But it is insisted in respondent's brief that a license was not required by the Pioneer Sugar Company, or its agents, and that it was not an "investment company" within the meaning of the act. The "Blue Sky" Law (Laws Utah 1919, p. 309) provides for two classes of corporations that may sell stock; the one being denominated an "investment company," the other a "dealer." The investment company is defined:

"'Investment company' for the purpose of this act shall mean every person, firm, foreign and domestic corporation, excepting those specifically exempted under section 2 of this act, that shall engage in the business within the state of Utah of selling or negotiating for the sale of any stocks, bonds, investment contracts or other securities herein called 'securities' issued by said person, firm, domestic or foreign corporation."

A dealer is defined:

"'Dealer' for the purposes of this act shall mean every person, firm, domestic or foreign corporation that shall sell or offer for sale within this state any of the stocks, bonds, investment contracts or other securities issued by any investment company as herein defined and except such as are specifically exempted as provided in section 2 hereof, or that shall by advertisement or otherwise engage in or profess to engage in the business of selling, bartering or offering for sale or exchange such securities."

A dealer may sell stocks and securities issued by an investment company. Section 4, Laws Utah 1919, p. 312, provides that no investment company shall sell or offer for sale or exchange within the state of Utah any securities as therein defined or engage in the business of selling or offering for sale such securities without first registering with the Commission and filing under oath a statement containing certain enumerated information. An investment company need not file a bond. A dealer is required to deliver a $5,000 bond to the Commission, and is required to display his permit in his place of business.

Taking into consideration all of the provisions of the act, it is obvious that an investment company is one that sells its own stock and does not engage in the business     3

of stock selling as a dealer does. In the case of *Guaranty Mortgage Co.* v. *Wilcox*, 62 Utah, 184, 218 P. 133, 30 A. L. R. 1324, a corporation selling its own stock is classed as an investment company. Another reason for treating as an investment company a corporation selling its own stock is the administrative interpretation of the law in harmony, with the views expressed in the Wilcox Case.

It is further claimed that the Pioneer Sugar Company was a cooperative organization and not a corporation in the strict or ordinary sense in which the word "corporation" is used. It is true that this sugar company was organized primarily to grow beets and manufacture beet sugar, and that no one could acquire any capital stock unless he also at the same time agreed to raise sugar beets for the company.     4, 5 A corporation can not be created except as provided by statute. It is a mere creature of law. The statutes of this state make no provision for a "co-operative corporation." The Pioneer Sugar Company was an ordinary corporation regularly organized under the laws of this state, and therefore was not exempt from the provisions of the "Blue Sky" Law, and had no right to sell stock except by authority of the Securities Commission and under its supervision and in accordance with its regulations.

The argument that subscriptions for stock were limited to beet growers and that the transactions did not constitute sales under the "Blue Sky" Law is not maintainable. The company had no assets when it was incorporated. It was a typical "Blue Sky" concern. It wanted and needed money with which to build a sugar factory. It inaugurated a stock-selling campaign confined to beet growers in certain counties of the state. The fact that a comprehensive plan for securing funds by selling corporate stock was adopted and that contracts for growing beets, an integral part of the plan, were to be secured at the same time, from the same persons buying the stock, did not change the nature of the        6 transaction and transmute into a co-operative agreement for raising beets that which was essentially a stock-selling scheme by the corporation for the purpose of securing capital with which to build a sugar factory.

The "Blue Sky" Law of this state provides that the corporation in its application for a permit to sell stock shall give the names of the agents authorized to solicit purchases of its stock; that there shall be charged and collected by the Commission a fee for the registration and authorization of such agents of an investment company of dealer, and it is further provided that "any contract of sale made in violation of the terms of this chapter, or without first applying for and receiving the license herein required, shall be unlawful and void."

It is true that no license or permit from the Commission would be required to solicit and obtain contracts to grow beets, but all these notes, beet contracts, and stock sales were parts of one general plan, and it will not do to say that a vital part of such a transaction can be eliminated as illegal and void and the remainder be legal and valid. Thus the contracts, stock sales subscription agreements signed by the defendant and other farmers who had stock sold to them, and the notes given by them, are so interwoven and intermingled that they constitute one single transaction. Remove any one proposition and the others fail. It is clear as language can make it that it was intended by the various instruments and stock sales subscription and the execution and delivery of the notes that they should stand or fall together.

"The entire contract is one the covenants of which have not been separated by the parties and which accordingly cannot be severed by the court. It is also said to be a contract in which the parties intend that each covenant shall be connected with and relate to every other covenant." 4 Page, Contracts, § 83.

"As a general rule, it may be said that a contract is entire when by its terms, nature, and purpose it contemplates and intends that each and all of its parts and the consideration shall be common each to the other and interdependent." 13 C. J. 561, § 525.

Now, if the contract of the Pioneer Sugar Company with the farmers was indivisible, and if some of the subscription contracts were illegal because secured by unlicensed agents, it follows that the whole transaction was tainted and saturated with illegality. 1 Black, Rescission and Cancellation, § 313, p. 796. Prima facie, at least, the evidence indicates that of the 3,000 acres of beet contracts and

of the $300,000 stock sales some were obtained and negotiated by persons with out permits or licenses from the Securities Commission. A substantial amount of stock having been sold in violation of the provisions of the statute, which expressly makes any such contract or sale both unlawful and void, and the various agreements constituting one indivisible transaction, the note herein sued upon was unenforceable by the Pioneer Sugar Company.

Though void as between the maker and the payee, the notes would not be void when in the hands of an innocent purchaser. The statute declares that a holder in due course holds the instrument free from any defect of title of prior parties and free from defects of prior parties among themselves, and he may enforce payment of the instrument for the full amount thereof against all parties liable thereon. The "Blue Sky" Law does not declare the notes void in the hands of innocent holders. They are void only in the hands of the original parties or those who are chargeable with notice or who are not purchasers in good faith. *First Nat. Bank* v. *Parker*, 57 Utah, 290, 194 P. 661, 12 A. L. R. 1373. Should the contract between the farmers and the Pioneer Sugar Company be construed as divisible, the result as between the Pioneer Sugar Company and the several hundred farmers, including defendant, would be the same. The transactions and sales by unlicensed agents were illegal and void. Deducting those sales and contracts from the total acreage, less than 3,000 acres remain, and it at once became the duty of the Pioneer Sugar Company to return the notes to the makers. It had no right to sell them to Woolley. If we are correct in the conclusion that enough contracts were obtained and enough stock sold by unlicensed agents to reduce the total of the acreage to less than 3,000, to trade these notes to Woolley was a breach of faith amounting to fraud.

It is argued by appellant that the acquisition of the notes by Woolley was fraudulent. The record is wholly devoid of any evidence of fraud, and the charge of conspiracy between the sugar company and Woolley to defraud those who pur-

chased the stock is without basis in the testimony. It appears that Woolley bought these notes before maturity for value. He was not called as a witness. Whether he had knowledge of the contracts entered into between the farmers and the Pioneer Sugar Company, whether he knew that the sugar company had not complied with the terms agreed upon, whether he knew stock had been sold by unlicensed agents are questions upon which the record throws no light. The burden of showing good faith was not undertaken on behalf of Woolley, nor is it material in this case if the plaintiff is a holder in due course, taking the note in good faith and for value and without notice of any defect in the title of the person negotiating it. The burden was on plaintiff not only to prove that it had no knowledge of the defective title of the payee and of its indorsee, but also to affirmatively prove its good faith.

On behalf of plaintiff, Mr. Culbertson testified that he was the president and manager of the plaintiff bank, and was such in January and February, 1921; that he, for the bank, purchased the note in question together with other farmers' notes of the aggregate value of $95,000 from Woolley on February 9, 1921, and in exchange therefor gave Woolley notes of the Chesney Stock Farm in the amount of $65,000, one note of E. L. Chesney for $60,000, another for $3,750, making a total face value of notes of Chesney Stock Farm and B. L. Chesney of $128,750. He further testified that the $65,000 note was secured in the bank by about 70 per cent. of the stock of the Chesney Stock Farm, a corporation doing business near Evanston, Wyo. Mr. Chesney and the Chesney Stock Farm were engaged in raising blooded cattle, hay, and grain, and had a ranch there. The Chesney notes were renewal notes for moneys which the bank had loaned and advanced to Chesney and to the Chesney Stock Farm for the full amount of the notes. He testified that the bank was required to take over several outfits of sheep and wanted to get rid of the responsibility of looking after live stock interests, that the bank did not choose to advance more money desired by Chesney, and did not want to take over the live stock. He

had learned that Woolley had interested himself in the Ches-
ney Ranch and was desirous of obtaining the property; that
Woolley, knowing the bank held the Chesney notes, sought
Culbertson and told him that he, Woolley, had decided to get
the Chesney property and that he thought the best way was
to buy up their obligations; that he already had bought or
contracted for some obligations from other parties, and, if the
bank would sell him its obligations, he would take over the
whole thing. Woolley offered the farmers' notes which he had
obtained from the sugar company, in exchange for the Ches-
ney notes. Witness first demanded $125,000 worth of far-
mers' notes for the Chesney notes, but Woolley offered only
$75,000. It was finally agreed that the bank would exchange
$128,750 of the Chesney notes for $95,000 worth of farmers'
notes. In Mr. Culbertson's opinion the Chesney notes were
easily worth $100,000. To the amount of $65,000, the Ches-
ney Stock Farm notes were secured by 70 per cent. of the
stock of the stock farm corporation. The value of the stock
was not shown. Woolley later sent to the bank, through a
Mr. Swan, a number of the farmers' notes. Witness asked
Swan what he thought of the ability of the makers to pay the
notes. Swan told him that after looking up a great many of
them he was convinced they were good farmers and would
meet the notes. Culbertson looked up the assessed acreage of
the makers, personally knew some of them, got all the informa-
tion he could in the short time, regarding the makers of the
notes—satisfied himself that the makers were responsible and
financially able to pay the notes. He further testified that
he conducted all negotiations on behalf of plaintiff, and, ex-
cept for explaining the matter to the loan committee, who
authorized him to go ahead, no one else connected with the
bank had anything to do with the transaction. He testified
that at the time of acquiring the notes he had no knowledge
or information whatever that there was anything wrong with
the notes in any way, or that the note sued upon or any of the
notes was made in connection with beet contracts or sub-
scription contracts or any other contract; that he had no
knowledge or information of any kind that the notes were

not to be delivered until 3,000 acres of beets were contracted for, or $300,000 worth of capital stock of the Pioneer Sugar Company subscribed for, or that the notes were conditioned upon such or any other terms or conditions, nor had he any knowledge that the note sued upon was given for stock or that the certificate of stock had not been delivered. He claimed to have no knowledge or information whatever of the contract referred to as preliminary expense agreement or of the contents thereof, or of the stock subscription agreement or the beet contract, or of any defense of defendant, or any of the other makers, against the notes. He testified that a Mr. Knox and Mr. Swan had both informed him that Woolley had sold the Hooper sugar factory to the Pioneer Sugar Company and had taken farmers' notes in payment therefor, but he did not know the circumstances or details of the transaction. As soon as he obtained the notes from Woolley he, as president of the bank, notified all the makers, including the defendant, that the bank had acquired and held the notes. None of the makers made any claim of any defense to the notes at that time.

On cross-examination Mr. Culbertson testified that he caused his secretary to examine the standing of the various makers in the Utah State Gazeteer and to indicate on each note the acreage of land each owned. He testified that when he received the notes they were all indorsed by the Pioneer Sugar Company; that he did not talk with the officers of that company to find out if they had indorsed for the company, did not ascertain whether they had authority to indorse the notes, did not know the officers of the Pioneer Sugar Company, did not know whether it had paid a corporation license tax; that he did not know the financial standing of the Pioneer Sugar Company; that he relied upon the fact that the farmers had signed the notes and thought they looked all right and were good. He did not talk to any of the makers before purchasing the notes. He did not look up the articles of incorporation of the Pioneer Sugar Company nor inquire of the Securities Commission regarding that company. He had known Woolley for several years, and the latter had done business at the bank.

Mr. Swan, one of the plaintiff's witnesses, testified concerning the conversation with Mr. Culbertson in which the worth of the makers, who they were, and what their standing was, was discussed, and that witness told Culbertson he thought the farmers' notes were good; that Woolley had sold the Hooper factory to the Pioneer Sugar Company, the people of whom were high-class men. Witness claimed to have no knowledge that the notes were coupled with any agreements, stock subscriptions, beet contracts, or that they were to be deposited with Halloran-Judge Trust Company until 3,000 acres of beets had been procured or $300,000 worth of stock subscribed. He testified he acted for Woolley in delivering the notes to the bank; that notes were also transferred to other banks; and that comparatively but a small amount of the notes was transferred to plaintiff.

Evidence and facts having more or less bearing upon the question of plaintiff's good faith are:

Mr. Culbertson testified that the bank had two notes of the Pioneer Sugar Company, of $25,000 each. Thus the bank had those two notes of the Pioneer Sugar Company, and about $95,000 in amount of other notes whose payment was guaranteed by the Pioneer Sugar Company. But no inquiry of any kind was made by him of the financial status of the Pioneer Sugar Company. He seemed to care nothing about the guarantor, nor whether the guarantee of payment was of any value or not. He made no inquiry except to ascertain whether the makers of the notes were financially responsible for the amounts of the respective notes. Nor were any embarrassing questions propounded to Mr. Woolley by Mr. Culbertson. No searching or any inquiry was made regarding the trade of Woolley with the Pioneer Sugar Company.

Another question that arises in connection with the claim of plaintiff's good faith is whether it gave full value for the notes it obtained from Woolley. Evidence that plaintiff gave value for the notes, including that of defendant, is very different from evidence that he gave full value. It is proof of the payment of full value that raises a presumption of good faith. *Pierson* v. *Huntington,* 82 Vt. 482,

74 A. 88, 29 L. R. A. (N. S.) 695, 137 Am. St. Rep. 1029. If plaintiff did not give full value for the notes for which it traded the Chesney notes, it is a circumstance for consideration by the jury as bearing upon the good faith of the purchaser.

Mr. Culbertson considered $65,000 of the notes good because they were secured by 70 per cent. of the capital stock of the Chesney Stock Farm Company. What the value of the stock was is wholly conjectural. There is no testimony on the subject.

The transaction between Mr. Culbertson, manager and president of the plaintiff bank, and Mr. Woolley was unusual in the number of notes acquired by the bank and in the amount involved, $95,000 worth of farmers' notes. It was not an ordinary transaction to purchase such negotiable paper. Plaintiff was a national bank, and had no right to trade in negotiable paper except in the manner provided by law. It may discount negotiable promissory notes and other evidences of debt. "This gives the power to acquire title thereto by purchase by way of discount, but in no other way." 13 3 Michie, Banks & Banking, § 260, p. 2005. Plaintiff thus did something which it had no right to do, a thing that certainly was a departure from the usual course of business. Here may be noted an incident of itself insignificant, but entitled to consideration with other circumstances. Mr. Woolley did not go to the bank to negotiate his notes, but sent for the bank's president and manager, who responded with alacrity to the summons, and entered into the negotiations that resulted in the acquirement by the bank of the note of defendant along with others. What Woolley's business relations were with Mr. Culbertson was not shown. If he was a financial magnate with every banker at his beck and call, Mr. Culbertson's action was not surprising, but, in the absence of any evidence on the subject, the incident was at least unusual. Culbertson was an interested witness. As president and manager of the bank he could not be otherwise.

Are the circumstances mentioned sufficient to make the good faith of plaintiff a jury question? The provisions of the statute here relevant are:

Comp. Laws Utah 1917, § 4086:

"A holder in due course is a holder who has taken the instrument under the following conditions:

"1. That the instrument is complete and regular upon its face:

"2. That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact;

"3. That he took it in good faith and for value;

"4. That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Section 4089:.

"The title of a person who negotiates an instrument is defective within the meaning of this title when he obtained the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as to amount to a fraud."

Section 4090:

"To constitute a notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith."

Referring to the above provisions, which are also in the Iowa statute, it is said in *Arnd* v. *Aylesworth,* 145 Iowa, 185, 123 N. W. 1000, 29 L. R. A. (N. S.) 638, that to justify the court in directing a verdict in plaintiff's favor "the testimony of the bona fide character of her holding must not only be without substantial evidence tending to impeach it, but the showing in its support must be so clear and unequivocal as to leave no room for difference of opinion concerning it among fair-minded men."

In 3 R. C. L. 1075, § 280, it is said:

"While the authorities uphold with much unanimity the rule that neither negligence, nor knowledge of suspicious circumstances, nor failure to make inquiries, will in or of itself amount to bad faith in a holder of negotiable paper who purchases it for value before maturity, yet they are equally consistent in holding that the existence of such facts may be evidence of bad faith sufficient to take the question to the jury; and especially is this so where the burden is upon the holder to establish the innocent character

of his purchase. Although suspicious circumstances are not notice as a matter of law, yet the jury may find them to be so as a matter of fact, and evidence going to show the existence of such grounds for suspicion is always admissible."

In 8 C. J. § 1376, p. 1063, the author says:

"However, in order to justify a directed verdict for plaintiff, the testimony of the bona fide character of plaintiff's holding must not only be without substantial evidence tending to impeach it, but must also be so clear and unequivocal as to leave no room for difference of opinion concerning it among fair-minded men. Furthermore, the uncontradicted evidence of plaintiff as to his being a bona fide purchaser in due course raises a question for the jury, unless supported by other facts and circumstances; and this is true as to the evidence of any interested witness. In those states, where circumstances which would place a prudent man on his guard in purchasing negotiable paper is sufficient to constitute notice to a purchaser of such paper, the circumstances which, in a particular case, should place a prudent man on his guard are questions of fact for the jury. It is improper to take the case from the jury on the ground that plaintiff is a purchaser from an innocent holder where reasonable men may properly infer that the holder in making the purchase acted for plaintiff who had actual knowledge of valid defenses. Where the burden of proof is on the holder to show that he had no actual knowledge of the fraud or of any facts constituting bad faith in taking the notes, and he makes a full and fair disclosure of the facts, and in no reasonable view of the evidence does it appear that he had the guilty knowledge described in the Negotiable Instruments Law, and there is no circumstance or other evidence contradicting it, or from which an adverse inference might be drawn, it is proper to take the question from the jury. But it must be a very plain and conclusive case to justify taking such question from the jury in favor of the party having the burden, since credibility of the evidence adduced in support of the claim of want of knowledge or good faith is for the jury to decide, and if they do not believe the evidence the holder has failed to discharge the burden resting on him by the terms of the statute, and the verdict should therefore be against him unless there is other evidence or circumstances sufficient for that purpose, and whether there is the jury at last must also decide."

In *Phillips* v. *Eldridge*, 221 Mass. 103, 108 N. E. 909, the plaintiff, who had sued on a promissory note which he had purchased, testified that in case the note sued on was not paid by defendants no credit was to be allowed to the payee

by reason of the transfer of the note to him by the payee. There was evidence that the note in suit was procured by a duress practiced by the payee on the makers, and plaintiff had the burden of proving that he was a holder in due course. The plaintiff and the payee, when called as adverse witnesses by the defendant, testified to facts warranting a finding that the plaintiff was a holder in due course. The court said:

"But the jury were not bound to believe their testimony, although uncontradicted, and therefore a verdict for the plaintiff could not have been directed as matter of law. When testimony warranting a finding that the plaintiff was a holder in due course of a note originating in fraud is given by witnesses called by the plaintiff it is settled that a verdict cannot be directed for the plaintiff as matter of law. *Merchants' National Bank* v. *Haverhill Iron Works*, 159 Mass. 158 (34 N. E. 93); *Stouffer* v. *Curtis*, 198 Mass. 560 (85 N. E. 180). And see generally in this connection *Lindenbaum* v. *N. Y., N. H. & Hartford Railroad*, 197 Mass. 314 (84 N. E. 129); *Domelman* v. *Brazier*, 198 Mass. 458, 465 (84 N. E. 856); *Giles* v. *Giles*, 204 Mass. 383, 385 (90 N. E. 595); *Leary* v. *William G. Webber Co.*, 210 Mass. 68 (96 N. E. 136). The fact that the testimony in the case at bar was given by witnesses called by the defendant as adverse witnesses does not change the result. That was in effect decided in *Emerson* v. *Wark*, 185 Mass. 427 (70 N. E. 482)."

In *Arnd* v. *Aylesworth*, supra, the court said:

"The courts accepting the rule of the Goodman Case have not been uniform in their holdings as to where the burden of proof lies in an action by the purchaser of negotiable paper tainted with fraud in its inception; but it has long been the doctrine in this and many other states that, such fraud being shown, the burden is not upon the defendant to show the plaintiff's bad faith in the purchase, but is upon the plaintiff to affirmatively establish his good faith in that transaction. *Keegan* v. *Rock*, 128 Iowa, 39 (102 N. W. 805), and cases there cited. It is important that this distinction be borne in mind in the consideration of cases like the one at bar, for it is quite possible that the testimony as a whole may be insufficient to justify an affirmative finding of bad faith on the part of the plaintiff, and still not be so conclusive of his good faith as to require a withdrawal of the question from the jury. *Cox* v. *Cline*, 139 Iowa, 128 (117 N. W. 48); *Mace* v. *Kennedy*, 68 Mich. 389 (36 N. W. 187). It is ordinarily to be expected, in these cases, that the purchaser will testify to his good faith and want of notice, and that defendant is compelled to rely upon circumstantial evidence to rebut such showing. Whether plaintiff

has sufficiently satisfied the burden resting upon him and made good his claim to be an innocent purchaser is therefore a question for the jury, save in those instances where the testimony is not only consistent with the good faith of such purchase, but is such that no fair-minded person can draw any other inference therefrom. A categorical denial of notice or knowledge is something which in many, if not in most, instances cannot be opposed by direct proof; and the credibility of the witnesses, their interest in the case, the reasonableness or unreasonableness of their statements, the time, place and manner of the transaction, its conformity to or its departure from the ordinary methods of business, and all the other facts and circumstances which, though of slight moment in themselves, yet, when taken together, give character and color to the purchase under inquiry, constitute a showing which the court cannot properly pass upon as a matter of law. Observing this principle it has frequently been held that a denial of notice by the purchaser, though he be uncontradicted by any other witness, is not sufficient to justify a directed verdict in his favor. [*Canajoharie Nat.*] *Bank* v. *Diefendorf*, 123 N. Y. 191 (25 N. E. 402, 10 L. R. A. 676); *Joy* v. *Diefendorf*, 130 N. Y. 6 (28 N. E. 602, 27 Am. St. Rep. 484); *McNight* v. *Parsons*, 136 Iowa, 390 (22 L. R. A. [N. S.] 718, 125 Am. St. Rep. 265, 113 N. W. 858)."

The facts in the *Arnd* v. *Aylesworth* Case are not similar to the facts in the case at bar, but we think that the general principles announced are sound.

In *Connelly* v. *Savings Bank*, 192 Iowa, 876, 185 N. W. 887, the facts, which are held to have made the good faith of the purchaser of a promissory note a jury question, are far from having the probative force of the evidence which in this case tends to establish bad faith on the part of plaintiff. In the Connelly Case the president of the bank testified that he represented the bank in the purchase of the note, and that it was purchased in the regular course of business, without any notice whatever of the nature of the consideration for which it was given or of the transaction in which it had its origin. The cashier of the bank also testified that he had no part in the purchase, and was wholly without knowledge or notice of any defect therein or defense thereto. When the note was offered to the president he wrote letters of inquiry to different banks in the county where the maker resided, asking if the maker was financially good for a note of $2,500. He also made some inquiries of individuals. The replies being

favorable, the bank bought the note from one Coughlin. The president testified further:

"I did not know him at all until I met him that first day—the day I bought the note. * * * Don't know where Coughlin is now. He is not now a customer of the bank. Haven't the slightest idea where he is. When I bought the note, all I relied on was Mr. Connelly's financial standing. When Coughlin came to me, I did not know him; did not know where he lived; did not know his residence. Did not know what business he was in. Did not inquire what the note was given for. All I wanted to know was whether the signature was genuine, the note negotiable, and the maker good. Made no inquiries as to the genuineness of Connelly's signature."

In the course of the opinion the court says there was no direct evidence rebutting the testimony of the bank's witness upon this point. It was claimed by the bank that its status as a holder of the note in due course and in good faith was established as a matter of law, and that the trial court erred in denying a motion for directed verdict. In the opinion it is said:

"Assuming, as we must, for the purposes of this appeal that the note in controversy was fraudulent in its origin, or at least that it was put in circulation by a breach of good faith on the part of Coughlin or his principal, we think it must be held that the question whether the intervener is a holder in due course and in good faith is a jury question. The statute, Code Supplement 1913, § 3060a59, imposes on the holder in such case the burden to prove affirmatively that he or some person under whom he claims acquired the title in due course. While it may be conceded that, in the various jurisdictions where this rule of law prevails, there is more or less variance in the strictness of its application to decided cases, and that some courts are more inclined than others to dispose of the issue so raised as a matter of law, it is comparatively well settled in this court that, unless it be in a very exceptional case, the question whether the burden so placed upon the alleged holder has been met and overcome is one for the jury."

Numerous cases are cited and many reviewed in the opinion.

In *Central State Bank* v. *People's Sav. Bank,* 196 Iowa, 43, 194 N. W. 233, it is said:

"It is true that the defendant's officers deny categorically all knowledge of such defect, but such denial creates an issue of fact and not of law. This is not in fact or in effect, as counsel seem to believe, a holding or suggestion that 'every plaintiff claiming

to be a holder in due course is dishonest or his testimony is un-
true.' It is the simple recognition of a settled rule of law that
the truth, weight, and value of human evidence is a question for
the jury and not for the court. Men of equal intelligence, integ-
rity, and fairness may fairly differ in their judgments and findings
upon any given showing. True, if there be no conflict' of evidence
and no fact or circumstances be shown to cast doubt or suspicion
upon the bona fides of the transaction, and no reasonable inferences
may be drawn by the jury from the facts and circumstances sur-
rounding the negotiation and purchase of the instrument tending
to show mala fides, then the court is justified in refusing to submit
such question to the jury. But the cases are rare calling for such
peremptory interference with the jury's functions. *Anthony* v.
*Association,* 162 Mass. 354, 38 N. E. 973, 26 L. R. A. 406, 44 Am. St.
Rep. 367."

In *Leavitt* v. *Thurston,* 38 Utah, 351, 113 P. 77, the general
rule is stated to be:

"While a jury may not arbitrarily disbelieve a witness and re-
ject his testimony, neither are they bound to accept a fact as es-
tablished merely because he testifies to it, when the circumstances
render its existence, or the testimony of the witness, improbable
or doubtful."

Can it be said in the instant case as a matter of law that
the evidence and the circumstances shown did not make plain-
tiff's good faith doubtful or questionable? Was the court
bound to accept as an established fact the good faith of plain-
tiff because testified to by Mr. Culbertson? We think not.
The issue of plaintiff's good faith, with other issues, should
have been submitted to the jury. The judgment is reversed
and a new trial is granted. Appellant to recover costs on
appeal.

GIDEON, THURMAN, and CHERRY, JJ., concur.

FRICK, J. I concur in the reversal of the judgment. I
do so, however, upon the sole ground that there is some evi-
dence upon the question of plaintiff's good faith in obtaining
the note sued on from Woolley which should have been sub-
mitted to the jury.

On Application for Rehearing.

WEBER, C. J.  A petition for rehearing has been filed herein, accompanied by vigorous argument which, while largely a repetition of the former argument, contains some new points.

Our attention is called to an issue raised in the trial court and also on appeal about which nothing is said in the opinion.  Counsel say:

"By express language of subdivision (d), the act (referring to the Blue Sky Law) is not applicable to commercial paper or negotiable promissory notes due not more than three years from their date.  The note herein was due thirteen months from the date of issue."

The act says that its provisions shall not apply to certain securities, and shall not apply to commercial paper or negotiable promissory notes due not more than three years from their date.  Obviously this language does not and cannot apply to notes in favor of a corporation taken for stock.  Plainly it means notes issued and sold and negotiated by a corporation.  It is what the company sells, not what it buys or acquires, or receives, that is referred to in the provision above quoted.  A corporation requires no license or permit from the Securities Commission to acquire or purchase promissory notes.  Here the sugar company was given the right by the Commission to sell its stock for cash or for notes; notes were not sold nor issued by it.  They were taken in payment of stock, and were not of the class referred to in the act.

It is contended and again argued that the Pioneer Sugar Company was not an investment company within the meaning of the act, and, if it was, its agents and dealers were not such agents as required a license or permit from the Securities Commission to do what was done by them.  Counsel insist that the effect of the decision is too broad; that the Legislature, when it says those "engaged in the business of selling stock," had reference to the habitual or regular occupation of a person, or that which occupies the time or labor of one as his principal concern.  In the opinion the distinc-

tions between investment company and dealer, as found in the statute, are set forth. The dealer sells stock of an investment company, while an investment company making sales must act through licensed or authorized agents. When the various provisions of the act are considered, it is obvious that it was the intention of the Legislature to have one class of corporations, selling their own stock and another class, or dealers, selling the stock at other corporations. In referring to an "investment company," the statute says it is a person, firm, or corporation that shall engage in the business of selling stock, etc. If the act is to be given a strictly technical construction, it can be held to mean that no permit or license was required by the Pioneer Sugar Company, unless it appears that the sole occupation of the company was stock selling, not sugar making. With this strict construction, the conclusion follows that the Pioneer Sugar Company was not an investment company, and that such a corporation may, without any permit or supervision from the Securities Commission, sell its own stock for promotion or other purposes. The effect of that construction would be to practically nullify the law, and the old system of "wild-catting" would be restored with all its evils. But, if possible, the law must be given a construction that will keep in view its beneficent purposes. Some light is thrown upon what is meant by "engaging in business of selling stocks" when section 18 is read in connection with section 3, defining an investment company. In section 18, requiring annual reports by investment companies, it provides what the reports shall show. See page 316, Sess. Laws Utah 1919. Why show the amount of the work done, the cost of the acquisition of property, its assessed value, and other information, if the only business of an investment company shall relate to the sale and negotiation of stocks? If an investment company is to be simply a stock dealer buying and selling stock, the language of section 18 would be without any purpose. We therefore conclude that, when the law is read as a whole, the act can be upheld, and that when the law speaks of being engaged in the business of selling stock it means engaged in the work of selling its own stock for the purpose

of financing a corporation's own requirements, and during such time as may be necessary to sell the desired amount. Any other interpretation would mean the removal of all supervision by the state of corporations selling their own stock unless they did that as their principal business and not for raising capital with which to engage in some business or enterprise. If we are to accept the construction insisted upon by respondent, we must not only say that "engaged in the business of selling" means that such business is the principal occupation of the corporation, but that it devotes its entire time to stock selling. Does that follow? Would it not be reading into the statute something inconsistent with the legislative intent?

It has also been urged that no license was required by the sugar company or its agents because only subscriptions for stock were taken. As we understand it, the defendant received no stock; he only subscribed for it and gave his notes for the stock. But that sort of a deal comes under the supervision of the Securities Commission, where the subscription is after the incorporation of the company, and is a purchase of stock, not merely a subscription. *Guaranty Mortgage Co.* v. *Wilcox*, 62 Utah, 184, 218 P. 133, 30 A. L. R. 1324.

Counsel criticizes what we said about the right of a national bank to trade in and exchange negotiable paper. The authorities agree that a national bank has a wide latitude in taking proper measures to prevent the loss of a debt. If the trading were wholly for the purpose of preventing loss to the bank it would have been easy to show that fact. As we understand it, it was a trade or exchange of notes, and that was all. As respondent well says, the maker could not defend on that ground; the government alone could complain. But in this instance it does establish the unusuality of the transaction. The circumstances of the transaction a jury would have a right to consider in passing upon the alleged bad faith of the respondent. Assuming that a national bank has the right and power to exchange and trade in promissory notes, it would still be an occurrence that

was not usual. If trading for $100,000 worth of negotiable paper of uncertain value was common with the plaintiff, or the national banks of Salt Lake City, it could easily have been shown, in which event the circumstances would probably be entitled to no weight whatever.

That the full amount of $300,000 worth of stock subscriptions were not taken and notes to that amount obtained in Salt Lake, Davis, Tooele, and Utah counties by January 26, 1921, seems to be fairly well established, when contracts and notes obtained by unauthorized or unlicensed agents are deducted.

So far we have considered only the date of January 26, 1921, or January 27, 1921; the latter being the date of the transfer of the notes to Woolley. As to this date, one witness testified that the subscriptions at most amounted to 3,068 acres. Another witness says 3,075 acres had been obtained; another 3,130 acres. The secretary of the company says there were more than 3,000 acres—how many more he would not attempt to say. As to the amount of subscriptions on February 9, 1921, when plaintiff and Woolley traded notes, the witnesses also differ. One places the subscriptions in the four counties at $320,000 on that date, with $326,000 on February 15, 1921. Another says that the contracts to grow beets amounted to 3,169 acres on February 15, 1921. As stated, we have considered only the subscriptions to January 26, 1921, the day before the trade with Woolley was consummated. Certainly those after February 9, 1921, should not be considered in view of the objection made by respondent's counsel, as shown by the abstracted record, that contracts obtained after that date were incompetent, irrelevant, and immaterial; the objection being sustained by the trial court. Repeatedly, questions were propounded to witnesses as to whether certain agents had been licensed. Objections to these questions were invariably sustained. It is thus impossible to say haw many contracts and what amount in notes were obtained by unlicensed agents, except that it appears, that less than the required number of acres had been obtained on January 26, 1921, by licensed agents. In any event, as stated in the opin-

ion, the defendant should have been permitted to prove which of plaintiff's sales agents were not licensed to make sales and had obtained no permission from the Securities Commission to act as sales agents for the Pioneer Sugar Company. The sustaining by the trial court of objections to these questions was prejudicial error and alone sufficient to entitle defendants to a new trial.

As to the question of good or bad faith of plaintiff in purchasing or trading for defendant's notes, with others, counsel for respondent say:

"The things pointed out to this honorable court are less cogent and persuasive than those pointed to by appellant and which were answered by us in our original brief."

The things pointed out by appellant are of importance. They are:

"It (plaintiff) took defendant's pretended note without the indorsement of either Ernest R. Woolley or the Pioneer Sugar Company. (2) It took defendant's pretended note with actual knowledge of the infirmities and defenses attached thereto, or with actual knowledge of such facts and circumstances that in taking defendant's pretended note it acted in bad faith commercially. (a) It knew the pretended note was given in pursuance of a stock subscription agreement. In July, 1920, C. G. Patterson asked the plaintiff to act as trustee for the Pioneer Sugar Company, and to hold stock subscription agreements and notes given in pursuance of said agreement, and on a later visit in August of 1920 to plaintiff for the purpose of opening an account for the Pioneer Sugar Company, Mr. Patterson told Mr. Culbertson, president of plaintiff bank, 'that the bulk of the Pioneer Sugar Company's assets would consist of notes taken from farmers for stock subscriptions. Plaintiff's own witness, Douglas A. Swan, who knew from the first that the Pioneer Sugar Company had obtained the notes from farmers, discussed with Mr. Culbertson the transaction so far as what they were for, told him Woolley had sold a factory to them, gave Mr. Culbertson a bunch of notes, who investigated the makers and returned $5,000 that he refused to accept. Mr. Culbertson, president of plaintiff bank, testified that Mr. Woolley told him the notes were farmers' notes, and that he had sold the Hooper Sugar Factory for them, that he, Culbertson, talked with several of the farmers, satisfied himself of the financial standing of the farmers, spent three or four days investigating notes. The day before the bank bought the notes Mr. Culbertson saw a letter of H. R. Macmillan's, till January 1, 1921, attorney for the bank, to the Knox

Bros., stating in his opinion the 'notes were negotiable.' Are we to infer from this that Mr. Culbertson concluded defenses were cut off? (b) Plaintiff had knowledge of the following circumstances surrounding the transaction involving the notes, and all pointing to the worthlessness and infirmities of the notes: (1) The notes had written on the back of them the guaranty of the Pioneer Sugar Company and in the fore part of February, 1921; prior to the 8th (the notes were purchased on the 9th), the bank knew sufficient of the value of the Pioneer Sugar Company's guaranty not to honor a $5,000 draft on the company. (2) The bank gave $128,750 of Chesney notes to Woolley for $95,000, consisting of 1,500 farmers' notes, and knew Chesney was on the verge of bankruptcy. (3) The notes, including defendant's note, were not indorsed, which charged plaintiff with knowledge of infirmities and defenses. (4) When asked to indorse the notes, including defendant's note, Woolley refused, and they both laughed. Mr. Culbertson said he had investigated the makers and found they were financially good, so he must have known it was not because of the financial standing of the farmers that Mr. Woolley refused to indorse the notes; that being so, the alternative is that it was because of some infirmity in the note itself; this circumstance and the notes being unindorsed charged the bank with knowledge of the infirmities in the notes that caused Woolley to refuse to indorse them."

Counsel for respondent complain that in the opinion Iowa cases are extensively quoted from, and they ask in effect whether we intend to adopt the extreme rule announced by Iowa, Massachusetts, and North Carolina. As an answer to this question, what was said by Mr. Justice Straup in *Leavitt* v. *Thurston*, 38 Utah, 351, 113 P. 77, referring to the North Carolina and Massachusetts rule, may well be repeated: "The facts of the case in hand do not require us to go to that extent. * * *"

Our attention has been called to *First Nat. Bank* v. *Hall*, 31 Idaho, 167, 169 P. 936. Referring to other Idaho cases, the court says that the rule apparently followed in that state is to "the effect that the question of whether or not a transferee of a promissory note is a bona fide purchaser in due course is one for the jury, save in those instances where the testimony is not only consistent with the good faith of such purchaser, but is such that no fair-minded person could draw any other inference therefrom, is subject, in that class of cases to which this one belongs, to the following modification:

Where the good faith of a party who claims to be the holder in due course of a negotiable instrument is an issue upon which he has the burden of proof, the credibility of his testimony in support of that issue, though uncontradicted, is for the jury.''

In *Auld* v. *Walker*, 107 Neb. 676, 682, 186 N. W. 1008, 1010, the doctrine announced by the court is:

"Although lack of knowledge, suspicious circumstances, failure to make inquiry, and negligence will not in themselves establish bad faith in the plaintiff, such facts, where the burden is upon him to establish the innocent character of his purchase, and the only evidence offered was his own testimony, constitute evidence of bad faith sufficient to take the question to the jury," citing Ostenberg v. Kavka, 95 Neb. 314.

In *Shawnee St. Bank* v. *Lydick*, 109 Neb. at page 84, 189 N. W. 606, the court says:

"A purchaser in good faith should be one who has purchased with due regard for the rights of the maker, and not one who, relying wholly upon paying value for the note and purchasing before maturity without knowledge of any defense, is indifferent as to whether or not the same was honestly obtained from the maker. Where the evidence tends to show such indifference the question of good faith is for the jury."

The doctrine announced by the Supreme Court of Nebraska is sustained not only by reason but by the weight of authority. In the instant case the question for the court was, Might men of ordinary intelligence draw different conclusions from the facts? If they might, it was a question for the jury; otherwise not. *Lentz* v. *Landers*, 21 Ariz. 117, 185 P. 821; *First Nat. Bank* v. *Wilson*, 57 Mont. 384, 188 P. 372; *Jenkins* v. *Helms*, 89 Okl. 77, 213 P. 323; *Arnett* v. *Sanderson*, 25 Ariz. 433, 218 P. 986. Applying this test, we are of the opinion that the court erred in instructing the jury to return a verdict in plaintiff's favor.

Petition for rehearing is denied.

GIDEON, THURMAN, and CHERRY, JJ., concur.

FRICK, J. (dissenting). I am unable to concur with my associates in denying the petition for rehearing in this case.

The opinion as it now stands not only cites and relies on decisions that have been rejected by the courts of those jurisdictions where the Negotiable Instruments Act is in force, but cases are cited that have actually been overruled and are not regarded as the law. Moreover, the opinion contains many statements that are in direct conflict with the decisions of this court relating to negotiable instruments. A rehearing should therefore be granted if for no other reason than to harmonize our own decisions upon the subject. The prevailing opinion, however, opens up so many doubtful questions that I am unable at this time to go into the matter in detail. It must suffice to say, therefore, that in my judgment a rehearing should be granted.

### On Second Petition for Rehearing.

GIDEON, C. J. Respondent has submitted a second or supplementary petition for rehearing. This court has not heretofore permitted the filing of such petition, unless it is made to appear from the petition that the court has erred in the conclusion reached or there is some statement in the opinion that is likely to be misleading, or that the language used does not reflect the court's intent. After considering the proposed second petition submitted in connection with application for permission to file the same, we have concluded to permit it to be filed.

It is not our intention to again review or restate the reasons which led the court to reverse the case. We are satisfied with the reasons stated in the opinion. Particular attention, however, is directed in the petition to two paragraphs in the original opinion. The first is:

"No inquiry of any kind was made by him (Culbertson) of the financial status of the Pioneer Sugar Company. He seemed to care nothing about the guarantor—nor whether the guarantee of payment was of any value or not. He made no inquiry except to ascertain whether the makers of the notes were financially responsible for the amounts of the respective notes. Nor were any embarrassing questions propounded to Mr. Woolley by Mr. Culbertson. No searching or any inquiry was made regarding the trade of Woolley with the Pioneer Sugar Company."

It is stated in the argument supporting the petition that it is to be hoped that no such doctrine will be established by this court. We are unable to see that any doctrine or principle of law is stated in the quotation. As we view it, that language is not harmful, and cannot be misleading when considered in connection with what is elsewhere said in the opinion and in view of the question under consideration. The writer of the opinion, at most, was simply enumerating further reasons why the question of good faith should have been submitted to the jury.

The other paragraph to which special attention is directed reads:

"Another question that arises in connection with the claim of plaintiff's good faith is whether it (plaintiff) gave full value for the notes obtained from Woolley. Evidence that plaintiff gave value for the notes, including that of defendant, is very different from evidence that he gave full value. *It is proof of the payment of full value that raises a presumption of good faith.* \* \* \* If plaintiff did not give full value for the notes for which it traded the Chesney notes, it is a circumstance for consideration by the jury as bearing upon the good faith of the purchaser."

Again, it should be stated that the foregoing language is to be considered and construed in connection with the context of the whole opinion and of the facts under consideration by the court. Lest, however, the sentence which we have italicized in the above quotation may not clearly reflect the intent of the court, it is now stated that it was not intended by that language to announce the doctrine which respondent seems to think has been announced—that a failure to pay full or face value for a negotiable instrument in and of itself raises a presumption of bad faith. The payment of less than the face value of a negotiable instrument does not alone establish bad faith, neither does the payment of face value alone establish good faith. The amount paid is only one element of the transaction. The sentence preceding and the one following the italicized language clearly indicate the court's intention, to wit, that under the particular circumstances and facts developed by the testimony in this case the question of whether the plaintiff paid full or face value was merely one circum-

stance to be considered by the jury in connection with other circumstances in the case in determining whether the plaintiff was a holder in good faith.

The opinion as thus modified is affirmed, and the petition for rehearing will be denied.

THURMAN and CHERRY, JJ., concur.

FRICK, J. In my judgment the modifications of the original opinion, as indicated in the opinion of Mr. Justice GIDEON, do not reach the difficulty, and therefore I adhere to my dissenting opinion.

Chief Justice WEBER'S term of office having expired, he did not participate in the decision on the second petition for rehearing.