[No. 17605.    *En Banc.*    December 7, 1923.]

THE FIRST NATIONAL BANK OF RITZVILLE, *Respondent,*
v. WILLIAM GUNNING *et al., Appellants.*[1]

BILLS AND NOTES (141)—GOOD FAITH AND PAYMENT OF VALUE—
EVIDENCE—SUFFICIENCY. A bank, discounting fraudulently procured
notes given for mining stock, is not shown to have had such notice
or knowledge of the fraudulent means by which the notes were se-
cured as to render it not a bona fide holder, where there was no
proof thereof and the several suspicious circumstances enumerated
resolve themselves merely into this; that the bank knew that the
notes were given for mining stock.

Appeal from a judgment of the superior court for
Spokane county, Lindsley, J., entered July 14, 1922,
upon the verdict of a jury rendered in favor of the
plaintiff, in an action on contract. Affirmed.

*C. E. H. Maloy,* for appellants.
*G. E. Lovell* and *E. A. Davis,* for respondent.

MACKINTOSH, J.—This is an appeal from a judgment
based upon a directed verdict of the jury in an action
brought to recover on a promissory note executed by
the appellants. The sole question is whether the ap-
pellants presented sufficient evidence in their defense
against payment to go to the jury.

The respondent purchased notes before maturity for
value. The appellants allege in their affirmative de-
fense, however, that respondent is not a holder in good
faith, for two reasons: first, because a conspiracy ex-
isted between the payee of the notes and the officers
of the respondent; and second, because the respondent
had notice of such facts and circumstances which ren-
dered it guilty of bad faith in purchasing the notes.

[1]Reported in 220 Pac. 793.

The main facts involved in the transaction are these: One Dudman, a mining promoter, was president of a corporation known as the Bethlehem Gold Mines Ltd., the company owning some property in Idaho. Dudman was engaged in a stock promotion sale, and in 1919 was interesting the farmers in Adams and Lincoln counties in the purchase of stock, and in March of that year opened an office in Ritzville and began his dealings with the respondent (and its predecessor, the Pioneer National Bank of Ritzville). Dudman, upon a sale of stock, would accept from the purchaser his promissory note, made payable to Dudman, and thereupon would sell the note to the respondent which generally purchased the note at the going rate of discount of ten per cent. The face of the note would be placed to the credit of Dudman's personal account, and he would issue his check to the respondent for the amount of the discount. Dudman would then use the money in his account for his own personal purposes and for the development work being done upon the mining property. These transactions with the respondent continued until sometime in May, 1920, during which time the respondent had purchased a considerable amount of the Dudman notes.

The transaction involved in this action, particularly, was this: On May 11, 1920, the appellants purchased 4,000 shares of mining stock and executed two promissory notes in the sum of $1,500 each, payable five months after date. On the 17th of the same month, appellants made a further purchase of 4,000 shares and executed a note for $2,000, due October 17, 1920. These notes were at once sold to the respondent. On or about December 11, 1920, the notes not being paid, the appellants renewed them by executing one note in lieu of the three, which is the note in suit. The respondent

was the payee of this renewal note. At the time the notes were discounted by the respondent, there was presented with them a memorandum, addressed to the respondent and signed by the appellants, which read as follows:

"It will be satisfactory with me if you should see fit to handle my note given to Mr. Dudman this day ...................................Dollars."

The answer alleges, and it may be assumed that the testimony shows, that the sales of this mining stock were accompanied by many false and fraudulent representations, and it is the claim of the appellants that they did not discover the fraud until February, 1921, and this action was begun in August of that year.

When the appellants put out their negotiable paper, they were charged with the knowledge that it might come into the hands of third persons; and, as their memorandum addressed to the respondent shows, they had actual knowledge that these notes were to be negotiated and to whom. They are relieved from liability upon their paper if it appears that the persons to whom it was negotiated, before maturity and for value, had, or should have had, such knowledge of the fraudulent means by which the paper had been secured as to render them not *bona fide* holders.

Many suspicions are relied upon to demonstrate the lack of good faith on the part of respondent, but when all of the appellants' testimony is weighed, there is nothing in it which rises above suspicion. No facts are proved, nor are any legitimate inferences to be drawn from the facts, which would justify the court in allowing the jury to speculate and conjecture in arriving at a verdict. The bank, of course, knew that Dudman was engaged in the sale of mining stock, but there is nothing in the testimony to show that the bank was

participating in his fraud, or had any knowledge of it, or was possessed of any information which would impute to it knowledge of his misdoings. The bank, of course, knew that it was a highly speculative venture; and, in fact, the testimony shows that it advised some of its customers that the purchase of mining stock was a matter of risk; and while the bank may be subject to criticism for jeopardizing its assets in the purchase of this kind of paper, still, there is no misconduct on the part of its officers to prevent its recovery on these notes. Hindsight on the part of the appellants does not excuse their lack of foresight, and many months after having entered into the transaction with Dudman, their discovery of the wiles by which they had been introduced to high finance is not proof that the bank knew more than they did of the true facts of the situation at the time the transaction took place.

The appellants enumerate several suspicious circumstances which they claim the jury should have been allowed to determine were facts proving the respondent's bad faith. When they are all analyzed they finally resolve themselves into merely this; that the respondent knew the paper which was being purchased had been given for mining stock. It is unnecessary to set out these various suspicions as that would do nothing more than encumber the opinion. The whole matter may be no better summarized than it was in the opinion of the trial court, from which we quote:

"The notes were in proper form and the bank purchased them, taking the discount and placing the balance of the purchase price to the credit of the payee of the notes, and the notes of any other taken by the same payee for the same consideration as in this case and with the same understanding were negotiated to and were purchased by the bank. I take it from the casual reading of the excerpts from some of the opinions that some courts have gone a long way in aid-

ing in the repudiation of commercial paper and charging some subsequent purchaser with a responsibility concerning it and the original consideration for it that is beyond the long and settled rules concerning commercial paper, but the question for the court to now consider is whether the testimony introduced here in behalf of the defendants would, if submitted to the jury, support a finding by the jury in their favor. Now, the suggestion that the court should submit every case to a jury where evidence of any kind is offered by a party does not find favor with me, because I do not believe, and the supreme court of our own state more than frequently asserts, that such practice is not the duty of the court.  .  .  .  In this case there is no evidence or proof of any fact of actual knowledge of fraud in the procurement of this paper on the part of Mr. Greene (president of respondent bank). There is no proof of any fact which would directly impute to him actual knowledge of fraud, which our supreme court has said in many cases he must have in order to constitute the bad faith which would constitute a defense to this action; unless, as counsel suggests, there may be drawn from such testimony as has been offered here, inferences of bad faith. That testimony shows Greene's knowledge of the purchase by Dudman of 150,000 shares of stock, in the spring of 1919, at three cents per share; of other purchases at ten cents per share. It shows that Dudman and Greene were in the bank at the same time. On one side it shows that Dudman did visit the house of Greene and conversed with him on the porch or in the house for as long as thirty minutes. This testimony is denied. It does show that Dudman visited the bank of which Greene is president at various times and different hours. There is nothing in all this that is different from or inconsistent with the transaction of usual and ordinary business. It is shown in this case that the citizens of Adams county who gave their notes for or otherwise purchased the mining stock which Dudman was selling, have suffered a loss or a liability. The fraud is always admitted to be a fraud when everybody said it is a fraud, and when it discloses itself as it does in this case at this time, and

yet the defendants here had not discovered the fraud which is now alleged and not denied on the part of Dudman, up until the time when their notes given to Dudman matured and they requested and obtained from the bank a renewal of their obligations which the bank had purchased, which renewal is the note in suit here. It is not suggested that any of the gentlemen, including the defendants here, who have testified, or others who were customers of the plaintiff bank, made any inquiry of the bank during the period from March, 1919, to May, 1920, to be advised concerning the purchase of the stock Dudman was selling, but it is suggested that the testimony offered by the defendants that on two or three different occasions Mr. Greene and Mr. Martin, when inquired of concerning somebody else's expected purchase of this stock had advised against it. It does not appear that any of these gentlemen complained about their investment in this stock and the negotiation of their notes with the bank, of which they had notice, until long after the execution and delivery of the notes to the bank, with one or two exceptions. The one witness who testified that he had signed a note and shortly afterwards, by request, signed a further request to the bank to negotiate the note which he had given to Dudman, after a night's reflection, went to the bank the next day and told the bank that he had come to the conclusion that the suggestion of the requirement to him to, in addition to his note, indicate to the bank his willingness to purchase his paper, had raised in his mind a suspicion as to the transaction and as to the good faith of the man who had obtained the note from him, and he gave the bank notice that he would refuse to pay it. The other gentleman, who talked brokenly, who testified here that he went to the bank and complained about his transaction with Dudman, finally disclosed the fact that what he complained about was the failure of Dudman after it occurred to keep a promise to him to redeem the stock which he had purchased or to repay him a sum of money. Now, I have expressed myself many times and have been for a long while, and at present am, of the opinion, as is intimated in the case of Larson v.

Betcher, that the legislature of the state should do something. . . . to protect investors in corporate securities in this state, but I know of no duty at the time imposed upon the bank of Ritzville to advertise to the people of Adams county that the investment in mining stock generally, or in this mining stock in particular, was poor business or a gamble in the prospect and its management. In every case called to the attention of the court in this case, including this case itself, every man who executed these notes in payment of mining stock knew at the time that those notes were to be negotiated with a bank in order to obtain money. . . . My opinion in this case is that there is no evidence to show bad faith on the part of Mr. Greene in the purchase of these notes which would justify the court or justify the jury in finding an inference or coming to a conclusion to that effect, and the court is not of the opinion, without any question, that if this evidence were submitted to the jury and the jury should so find the court would be obliged to set aside such verdict because it would not have substantial evidence to support it. These notes were put in circulation by the lack of diligence and the negligence, it might be said, of these men in Adams county for the then express purpose of having then negotiated and thus procuring the money for the present needs of Dudman, as he then represented it, for the continued and further development of the mine in which they were buying stock. It seems to me that this case has now reached a point, considering all the testimony, where nothing appears that the court could submit to the jury upon the question of bad faith on the part of Mr. Greene or the bank which would support a finding of the jury to that effect.''

In the case of *First National Bank of Medical Lake v. Wiltzius,* 122 Wash. 637, 211 Pac. 275, which also dealt with Dudman notes, a judgment against the bank was affirmed, for the reason that the bank had been specifically put on its inquiry as to the inducements upon which the notes had been acquired, and the jury

had evidence from which it could properly have found that there was lack of good faith, and that case is thus distinguishable from the case at bar.

The judgment is affirmed.

MAIN, C. J., BRIDGES, FULLERTON, PARKER, and TOL-MAN, JJ., concur.