# NATIONAL BANK OF THE REPUBLIC v. BECKSTEAD

No. 4409.   Decided October 25, 1926.   (250 P. 1033.)

422

*Pierce, Critchlow & Marr* and *Joel Nibley,* all of Salt Lake City, for appellant.

*Willey & Willey,* of Salt Lake City for respondent.

FRICK, J.

The plaintiff, a national bank, brought this action to recover judgment on a negotiable instrument as the indorsee of such instrument. The complaint is in the usual form in an action by a holder who obtained the instrument before

due, in due course. The note was made payable to the Pioneer Sugar Company, and by it indorsed to one Woolley, who exchanged it to the plaintiff for other notes held by the plaintiff. A copy of the note is made a part of the complaint.

The defendant in his answer to the complaint admitted the signing of the note, but denied its delivery and indorsement, and for want of information, also denied that the Pioneer Sugar Company had sold and indorsed the note to the plaintiff. As affirmative defenses the defendant also averred that the note was signed by him upon certain conditions which were set forth in certain contracts to which reference will be hereinafter made. The alleged conditions are fully set forth in the answer, however. The defendant also alleged failure of consideration, setting forth the facts in detail, and also averred that the note in question had not been delivered to the payee thereof. He further averred that plaintiff was not a holder in due course and that it took the note with notice of its infirmities, all of which are fully set forth.

The plaintiff filed a reply in which it denied the averments of the affirmative defenses and pleaded the facts concerning its purchase of the note, and alleged that it purchased the same in good faith, and that it is a holder in due course before due for value.

Upon substantially the foregoing issues the case was tried to a jury, which returned a verdict for the defendant. Judgment was duly entered upon the verdict, from which appellant appeals.

The writer feels constrained to state at this point that, in view that the defendant implicitly relies on the decision in *National Bank of the Republic v. Price*, 65 Utah, 57, 234 P. 231, and in further view of some expressions and statements contained in the opinion in that case, it will be necessary to state the facts more fully and to review the authori-

ties at much greater length than it ordinarily would be necessary to do.

The plaintiff proved the indorsement by the original payee and introduced the note in evidence. It was then stipulated that $25 is a reasonable attorney's fee, and the plaintiff rested.

The defendant, in support of the averments in his answer, then introduced his evidence, which, in substance, is as follows: The defendant testified that he signed a certain stock subscription agreement, which agreement was introduced in evidence, the material parts of which are that the subscription agreement was entered into between the Pioneer Sugar Company and the defendant; that the defendant subscribed for six shares of the capital stock of the company, for which he gave his note for $600, payable on or before January, 1926; that it was mutually agreed between the parties to the agreement that the defendant agreed to "plant and deliver not less than six acres of sugar beets to the company during each of the years 1921, 1922, 1923, 1924, and 1925," and that the company would accept said beets "in accordance with the terms and conditions of that certain sugar beet contract made in duplicate by and between the parties hereto of the date of August 7, 1920." The company was therein authorized to make certain deductions not material here. It was further agreed that the defendant would not during the years aforesaid plant beets for any other person, firm, or corporation. The contract then provides:

"The terms and conditions of this contract are that the company will cause to be held in trust the said note for the purchaser until three thousand acres of beets are contracted to be grown for the company by the farmers of Salt Lake, Davis, Utah and Tooele counties, and the sum of three hundred thousand dollars ($300,-000.00) in stock subscriptions is taken from the aforesaid farmers.

"In the event that the foregoing acreage and subscriptions are not secured by the close of the day of February 15, 1921, then this agreement is null and void and the purchaser's note shall be returned to him, and all agreements and contracts made between the pur-

chaser and the company shall be canceled; otherwise, to remain in full force and effect."

It was further provided that Halloran-Judge Trust Company is appointed trustee and that the contracts and the note and stock shall be deposited and held in trust by the trustee "pending the fulfillment of the conditions herein stated, and that upon the failure of the said conditions that the said trustee is to return the said note to the purchaser [the defendant herein] on demand, and upon the performance of the conditions the trustee is to deliver the stock to the purchaser and the company will regain possession of the note." The foregoing agreement was duly signed on the 7th day of August, 1920, by the company and by the defendant. The defendant further testified that thereafter, on February 1, 1921, the $600 note first given by him and mentioned in the foregoing agreement was returned to him, and that he signed five notes for $120 each on that day. The defendant then introduced in evidence another agreement entered into between him and the company dated August 7, 1920, in which it was in substance provided:

"That for the purpose of securing a sugar factory in Salt Lake county to be operated upon the co-operative principle and with the express understanding that this agreement is one of a series substantially identical in terms and intended to be circulated for subscription concurrently herewith in any or all of the counties of Salt Lake, Davis, Tooele or Utah, and expressly agreeing that all such agreements shall be deemed as one contract for the purpose of binding all the respective subscribers hereto to aid and assist in the establishment of a co-operative sugar company in Salt Lake county, and, in consideration of the mutual promises and obligations of the signers of the agreements herein designated, each of said signers undertaking to produce sugar beets under the terms and conditions imposed herein because of the personal benefit expected to be derived from sugar beet production under the co-operative plan and which benefits cannot be realized without the support of all the signers, the grower agrees to grow in each of the years 1921, 1922, 1923, 1924 and 1925, from seed supplied under the direction of the company not less than 6 * * * acres of sugar beets, to be grown on lands under the control of the grower that are best

suited to beet production, and to sell and deliver the entire crop therefrom to the company, its successors or assigns, and the company, its successors or assigns, agree to buy and pay for said sugar beets upon all and singular the terms and conditions herein set forth."

It is then provided what the beet grower shall do in producing beets and what the company shall do. The time and place for the delivery of beets is then stated, and when payments for beets shall be made. It is then provided that the company agrees to erect suitable dumps and unloading stations for beets. The right to purchase sugar in certain quantities by the grower is then provided for, and that the cost of the sugar is to be deducted from the price paid for the beets. It is then provided:

"In the event that 3,000 acres are not signed and stock subscriptions to the Pioneer Sugar Company to the amount of not less than $300,000.00 are not secured in the counties herein mentioned before February 15, 1921, this agreement shall be null and void; otherwise to remain in full force and effect.

"This agreement shall bind the grower, his heirs and personal representatives and shall not be transferable by him or them except to the purchaser of the lands owned by the grower."

That agreement was also signed by the company and the defendant. The defendant testified that he produced six acres of beets in the year 1921; that no dumps for unloading beets were furnished by the company that year, and that he sold his beets to the Utah-Idaho Sugar Company; that he did not receive any stock from the company, and never demanded any, and that he never was furnished any sugar for his family use. On cross-examination he further in effect testified that the agreement was that the company should acquire a sugar factory and should purchase the beets from the subscribers for stock and pay for them upon a graduated or sliding scale in accordance with the price that the company should receive for sugar. He then was asked this question: "The particular thing that you expected to achieve by the establishment of the Pioneer Sugar Com-

pany was the participation in the profits—payment on a sliding scale rather than on a flat rate per ton for beets, wasn't it, Mr. Beckstead?" He answered: "Yes, sir. We were to get more for our beets." He also said that he received payment for his beets from other sources upon a sliding scale, but he thought that he did not receive "exactly the same" that he was to receive from the company. He then identified and admitted that he signed another agreement, which was admitted in evidence on cross-examination. That agreement, with some slight additions, was substantially the same as the agreement dated August 20, 1920, which we have hereinbefore set forth. There was, however, an important omission from the last agreement, namely the provision that the notes, stock, and contracts should be deposited with a trustee was entirely omitted. That agreement was dated and signed on the same day the note in suit was dated and signed, to wit, February 1, 1921. Still another agreement designated "preliminary expense agreement" was entered into and signed by the company and the defendant. That agreement was dated August 20, 1920. In that agreement it was provided that the defendant "contributes the sum of $60 to the company to be used by it in payment of the general expenses as the board of directors may deem necessary or consider wise and prudent to incur in the conduct of its business." It was also provided therein that "the company accepts the aforesaid contribution and agrees to use the same solely in advancing its interests in accordance with the best collective judgment of the board of directors." The company also agreed to issue so-called expense certificates for the contributions which were to be paid by the company to reimburse the contributors for the contributions made by them. The agreement also contained the following provision:

"It is further mutually agreed between the parties hereto, that, in case the company fails to secure beet contracts to the amount of 3,000 acres and stock subscriptions to the amount of $300,000.00, in the counties of Salt Lake, Davis, Tooele and Utah, before February

16, 1921, that the payments herein made shall be used, together with all other payments on similar agreements, as the basis on which to continue the company in business and enable it to carry out the purpose of its creation, in which event the contribution herein made shall be credited upon a stock subscription in the company."

We remark that the foregoing agreements were intended to be signed by all the subscribers, and it was provided that they should be construed together as one agreement, although each subscriber signed a separate agreement.

The defendant then produced as a witness the former secretary and treasurer of the company, who had also acted in the capacity of a director of the company. The witness testified that the contracts and notes were not deposited with the trustee named in the contract. He also testified to a list of agents who were authorized under the so-called "Blue Sky" Law (Laws 1919, c. 111) to solicit and obtain subscriptions for stock. The witness also explained the transactions of the company and the attempts it made to acquire a sugar factory. He identified the minutes kept by the board of directors, and in that connection stated what efforts had been made by the company to acquire a sugar factory, and he produced the minutes of the board meeting which were introduced in evidence. We here insert the minutes as produced by witness:

"Edgar M. Ledyard, being called upon to report the result of his investigations of the properties of the Springville-Mapleton Sugar Company, submitted a written report covering in detail the result of his investigations of said plant and submitted his estimate as to the value of the plant and appurtenances at five hundred thousand dollars. Mr. Ledyard likewise submitted a report of a visit and investigation of the factory of the Interstate Sugar Company at Hooper, Utah; he compared the advantages and disadvantages existing between the plant at Hooper and the one at Springville, and made an estimate of the value of the Hooper plant as nine hundred thousand dollars."

Another part of the minutes of the board of directors reads as follows:

"The subcommittee reported that Mr. Douglas A. Swan, a certified public accountant, acting for Mr. Woolley, had presented a balance sheet showing the conditions of the accounts of the Interstate Sugar Company as of December 31, 1920; that this balance sheet showed current assets in the sum of $153,310.35; factories and equipment, $2,575,868.74; total expenses and maintenance, $1,255,534.89; total current liabilities, $1,694,088.38; total miscellaneous earnings, $40,625.60; common capital stock, $1,250,000; preferred capital stock, $1,000,000.00.

"And that the said trial balance contained a note stating, 'maintenance charges and the expense charged under operation may be charged at least in part to reconstruction cost.' That the committee called to its assistance Mr. Ryker (?), the cashier of the U. S. Smelting, Mining & Refining Company, to examine with them the trial balance submitted by Mr. Swan; and that upon interrogation of Mr. Woolley and Mr. Swan, this gentleman had assured the committee that in the acquisition of the stock of the Interstate Sugar Company all legal requirements had been met, and that they estimated that the current assets of the said company would be sufficient to discharge its current liabilities.

"The committee further stated that Mr. Woolley proposed to sell to the Pioneer Sugar Company preferred stock in the Interstate Sugar Company of the par value of $500,000, and common stock of the par value of $655,000, for a total sum of $650,000, and that the terms of said sale should be $150,000 cash to be paid within a reasonable time, said cash payments to commence at an early date, which date had not been definitely fixed, and that he would accept in payment of the remainder beet growers' notes taken by the company to the amount of $500,000, said notes to bear interest at the rate of eight per cent and to be secured in accordance with the provisions of a contract and agreement which he would have prepared to be signed by the said growers."

The witness also testified that the notes were not placed in escrow because the trustee demanded $3,000 for its service, and that the then secretary of the company deemed that amount too large and did not make the deposit in order to save the expense to the company. He also testified to the number of acres of beets that were subscribed by authorized agents and that the number of acres that had been subscribed at the time the notes were negotiated by the company was in excess of 3,000 acres, and that the stock subscriptions

were in excess of 300,000 shares. He, however, also testified that some subscriptions were taken by unauthorized agents, but that such suscriptions were in excess of the 3,000 acres required, and that the stock subscriptions obtained by such agents were in excess of the 300,000 shares required. The witness also produced a certain report of the board of directors of the company respecting the action of the board in attempting to acquire a sugar factory: The report reads as follows:

"The Pioneer Sugar Company, 201 Scott Building, Salt Lake City, Utah.

"Pioneer Sugar Company Stock Subscribers—Gentlemen: The Pioneer Sugar Company announces its newly elected board of directors as follows: B. Y. Benson, director and president, Cache county, Joseph Smith, director and vice president, Salt Lake county, Parley L. Glover, director and treasurer, Salt Lake county, C. G. Patterson, secretary, Salt Lake City. Directors, M. O. Miner, Utah county, and A. Jorgenson, Cache county, Joseph F. Palmer, A. F. Lundquist, Paul E. Nelson, James Wood, Salt Lake county.

"This board of directors are pleased to state that they have made satisfactory financial connections and have secured control of sufficient sugar factories now operating and under construction in Utah and Idaho to slice more than 10,000 acres of beet this fall. It is no longer a question of getting a factory.

"The plant contracted for is located at Hooper, Weber county, Utah, and the interests controlling in said plant also control in the factory that is being erected in Cache Valley (Whitney, Idaho) which will be ready to cut beets this fall.

"These properties are being taken over at a price and upon terms that the directors and competent engineers and business men consider fair, reasonable and just, and support has been pledged the farmers which will enable them to pay for these factories and erect others without delay.

"The interests backing the company in this purchase have assured your board that they are fully convinced that the principle on which the Pioneer Sugar Company is founded is solid, right and economically correct. That being true, it should and will have the moral and financial support of all interests.

"The interests we are talking about are those whose influence reach the big banks in Chicago, New York, and other cities. The only way we can show these gentlemen that we are self-supporting is to support our own undertaking to the limit, and that we prefer to do.

"In order that you will be fully informed and have an opportunity to approve the acts of your board and financial advisers, it has been decided that a banquet will be held at the Utah Hotel on Tuesday, January 24, at 7 p. m., at which time all stockholders are urged to be present and learn first hand the full financial program as proposed. You will find inclosed card of acceptance which you will sign and return at once enabling us to know the number of plates to lay in order that all will be accommodated. Most sincerely yours, The Board of Directors of the Pioneer Sugar Company, By B. Y. Benson, President."

The report, the witness said, was sent by United States mail to all the stock subscribers. The witness further testified that pursuant to the report mailed to the stock subscribers a banquet or meeting was duly held at the Hotel Utah, at which banquet over 400 persons attended, all of whom were stock subscribers except 15 or 20 who were agents of the company; that a full report was there made of what the company had done regarding the purchase of the Hooper factory mentioned in the report and what it contemplated doing respecting the matter; that the report was approved at the meeting, and that the stockholders present made further contributions at that meeting to meet certain expenses of the company, as will more fully appear hereinafter. This witness also explained how the notes of the subscribers were exchanged for capital stock of the Hooper factory, and that the subscribers' notes in an amount stated were indorsed and delivered to Mr. Woolley for the stock of the Hooper factory. It was also shown by defendant's witnesses that before negotiations were entered into by the officers of the company for the Hooper factory the then secretary of the company had gone East to the money centers and had tried to dispose of the stock notes obtained from the subscribers for the purpose of obtaining money to erect a sugar factory; that the secretary could not dispose of the notes in the East and could not obtain the necessary money in that way to erect a sugar factory. It was also shown that the company never operated the Hooper

plant and that the whole scheme failed of consummation and that the subscribers obtained nothing in return for their obligations.

After in substance establishing the foregoing facts, the defendant rested. The plaintiff then interposed a motion to strike nearly all of defendant's evidence as immaterial and irrelevant. The court overruled the motion to strike, but in making the ruling intimated that there was no evidence "to indicate that the present holder of the note [the plaintiff] had any knowledge or notice of anything excepting that defendant signed the note." The defendant then asked and was given leave to withdraw his "rest," and he produced a Mr. Patterson, the former secretary of the company, as a witness. The witness was then asked by counsel to "relate to the court briefly the plans and purposes and the nature of the organization of the Pioneer Sugar Company." The witness answered:

"The Pioneer Sugar Company was organized, that is the corporation was formed for the purpose of establishing a co-operative sugar factory or sugar factories. The purpose of the organization was to enable those who produced sugar beets to control the manufacturing end of the beet sugar business in this territory; instead of selling their raw beets they would sell the manufactured product and receive any profit that might be had resulting from the manufacture of their beets into sugar; that was the purpose of the organization."

He was asked the further question:

"Some time during the summer or early part of 1920, or about the time when the articles of incorporation of the Pioneer Sugar Company were filed, you had a conversation with Mr. Culbertson of the National Bank of the Republic, relative to the notes given to the Pioneer Sugar Company? That may be answered Yes or No."

The witness answered "No," after which, as appears from the abstract, he testified further as follows:

"Had a conversation about the opening of an account for the Pioneer Sugar Company. I think in a general way I told him what the assets of the company were. The Pioneer Sugar Company opened

an account with the National Bank of the Republic. My conversation with Mr. Culbertson lasted, as I recall it, between five and ten minutes and as I recall it I made a brief outline of the corporation."

In answer to the question why the notes were not deposited with a trustee the witness said:

"For the reason that the company considered that they were not getting value from the Halloran-Judge Trust people, that they were performing any service, that is that the Halloran-Judge people could not perform any service to the company that would result in a benefit to it, I helped in the negotiations with the Halloran-Judge Trust Company. I am not sure whether any other member of the committee visited the Halloran-Judge people with me the first time. A committee had been appointed. The Halloran-Judge Trust Company wanted an initial fee of $400, I think, and there would be other expenses from time to time, kind of a progressive proposition. I ascertained that if the contracts and notes were deposited with the Halloran-Judge Trust Company it would have cost the Pioneer Sugar Company something like $3,000.00 for their services in the performance of that trust.

"When the negotiations were made whereby the notes were transacted to Woolley, I ascertained what acreage had been obtained in Salt Lake, Davis, Tooele, and Utah counties and also the amount of stock that had been subscribed. The acreage obtained was over 3,000 acres and more than $300,000 stock subscriptions had been obtained. I do not remember the exact acreage. I was only concerned in determining whether or not 3,000 acres and $300,000 of stock subscriptions had been obtained, and after I satisfied myself on that point I was not concerned as to the exact amount.

"In December, 1920, I spent practically a month in the east investigating the proposition of the price at which material could be obtained to build a factory and whether or not the notes that the Pioneer Sugar Company had could be used as a purchase price or part of the purchase price of building a new plant. The company had no funds or money with which to build a factory except as it could do so out of these notes.

"I was present at the meeting that was held in the Utah Hotel in the latter part of January at about the time of the negotiations between the Pioneer Sugar Company and Mr. Woolley. There were three or four hundred people present at this meeting and with a few exceptions I presume they were people who had signed up the subscription notes, stock subscriptions. The meeting was called, as I remember it, to raise funds for the purpose of closing negotiations

if it could be done with Mr. Woolley or whoever would give this company possession of a factory—control of a factory. That, I think, was the primary purpose of the meeting. There was a lot of talk at that meeting, speeches were made to the effect that the company had completed negotiations with Mr. Woolley or was ready to complete negotiations, that they had reached a basis of an agreement by which the Pioneer Sugar Company would come into possession of the control of the Interstate Sugar Company, and that the Interstate Sugar Company was operating a factory at Hooper, Utah. That they owned the machinery at Corcoran, California, that is the machinery of a factory ready to be erected at Whitney, Idaho. It was stated at the meeting that it had been called for the purpose of raising money to complete the negotiations. Several thousand dollars was raised; probably $7,000 or $8,000 in cash and a lot of notes were taken. The total subscriptions at that meeting, as I remember it, ran around $15,000 in cash and notes. I never heard any objection at that meeting made by anybody to going through with the deal. Everything was very harmonious. I heard no objection made either publicly or privately. I remember that Mr. W. W. Armstrong and Mr. Benson both spoke that evening, also Mr. Williams."

### The witness further testified:

"Q. Mr. Patterson, what was it now that you said to Mr. Culbertson there when you were there at the bank about the bank accepting? You said that you had talked with him about accepting the trusteeship. What did you say and what did he say? A. If I remember, Mr. Peterson went with me into Mr. Culbertson's office. I stated to Mr. Culbertson that the Pioneer Sugar Company had decided to make his bank, the National Bank of the Republic, a trustee for certain of its papers and documents, and Mr. Culbertson at once reached up over in behind the pigeon hole in his desk and pulled out a little desk book, and stated that the law prohibited the national bank from acting in the capacity of a trustee, and read us the section of the law, and dismissed us.

"Q. That is all there was to it? A. That is all there was to it. He said he was sorry, but he was prohibited and he could not do it. He recommended to us the Tracy Loan & Trust Company. We immediately left his office and called on the Tracy Loan & Trust Company."

After producing the foregoing evidence the defendant again rested and the plaintiff then interposed a motion for a directed verdict. The motion was overruled, which ruling was duly excepted to by the plaintiff.

Mr. Culbertson, the president of the plaintiff bank, then took the stand and made full explanation of how the notes were obtained by him for the bank. It was made to appear that the bank held a large amount of notes of what is called the Chesney Stock Farms, a corporation of Wyoming owning a large ranch in that state; that the notes amounted to over $100,000 face value; that in order to save the stock farm and to continue it more money was needed; that the plaintiff bank was loath to invest more money in the farm, but that Mr. Woolley was desirous to obtain the Chesney Farm notes; that when Mr. Woolley offered to exchange the farmers' notes Mr. Culbertson made inquiry respecting the financial standing of the makers of the notes, and found that with very few exceptions the makers of the notes were financially able to pay the notes when due; that he was the only person representing the bank in the transaction, and he alone knew the circumstances respecting their negotiation; that he had no notice of any infirmity in the notes, and had not heard of any, but, upon the contrary, believed that the signers of the notes were reliable and would pay them, and that there was no defense to the notes; that he at once caused notice to be given to the signers of the notes, and that no intimation was made by any of them that there was any defense to the notes, and that he obtained them in good faith and without any knowledge or notice of any infirmity. It was also made to appear that he considered the notes he transferred to Woolley to be of the value of $100,000, while the face value of the notes he received from Woolley was $95,000. The evidence of Mr. Culbertson was in no way assailed or contradicted. Indeed, there is practically no conflict in the evidence in the entire case.

The plaintiff then rested and renewed its motion for a directed verdict. The motion was overruled, and the plaintiff excepted, and now insists that the court committed prejudicial error in refusing to direct a verdict for the plaintiff.

Plaintiff's counsel vigorously insist that there is no evidence in the record to sustain the verdict and judgment. Upon the other hand, defendant's counsel advance a number of reasons why the court was required to submit the case to the jury. It is more convenient to first examine into and discuss the propositions advanced by defendant's counsel.

They contend that the evidence is to the effect that plaintiff's title was defective, and therefore the defenses of failure of consideration; that the signature to the note in question was obtained by "unlawful means," amounting to fraud; that the subscriptions for stock and the notes were solicited and obtained by unauthorized persons and in violation of the provisions of the so-called "Blue Sky" Law; that the "plan and scheme" for which the note in suit was given was tainted with fraud, and that the conditions upon which the note was signed and delivered to the company by defendant were not complied with, but were violated, and each and all were sustained by some substantial evidence. It is further insisted that, although subscriptions for more than 3,000 acres of beets and for more than 300,000 shares of stock were obtained by duly authorized agents, the evidence is nevertheless undisputed that there were also some subscriptions obtained by unauthorized persons. It is also contended that all of the subscription contracts must be construed as in pari materia, and thus, if any subscriptions were obtained by unauthorized persons, all of the subscriptions are tainted, and must fail.

Is the latter contention sound? We think not. The condition of the subscription was that when subscriptions for 3,000 acres of beets and for 300,000 shares of stock had been obtained the notes should be valid and the company should be entitled to the possession thereof. The defendant's own witnesses left no room to doubt that the foregoing condition had been fully met before the notes were indorsed by the company and delivered to Mr.

Woolley. The contention that the note in suit is invalid because the condition upon which it was delivered was violated can therefore not be sustained.

Nor can the contention prevail that because some subscriptions were obtained by unauthorized persons therefore all subscriptions are vitiated. It would be a monstrous doctrine to hold that, although the condition ■ that the subscription for 3,000 acres of beets and over 300,000 shares of stock were obtained the notes should be invalid because thereafter there were a few subscriptions obtained by unauthorized persons, and that the latter subscriptions would vitiate all of the subscriptions although a sufficient number of subscriptions had been lawfully obtained. The law is that, where subscriptions for stock are conditional, the subscriptions become effective as soon as the condition is performed. In 14 C. J. at page 542, § 809, the law is stated thus:

"A subscription to the stock of a corporation on condition that all or a certain amount of the capital stock should be subscribed becomes binding absolutely as soon as the condition is performed."

When the notes purchased by plaintiff were negotiated by the company the condition respecting the number of acres of beets and the amount of shares of stock that should be subscribed to make the notes effective had been fully performed. That fact was established by the defendant's own witnesses, and hence there can be no question concerning it.

In this connection it is, however, also contended that the agreement that the notes should be deposited with a trustee who should retain the same until subscriptions for 3,000 acres of beets and for 300,000 shares of stock should be obtained had not been complied with. It is true that the notes were not deposited with a trustee, and as to that there was a technical violation or breach. It is, however, ■ also true, and the fact is again established by defendant's witnesses, that when the notes including the note in suit were negotiated by the company and were delivered

to Mr. Woolley the condition hereinbefore stated had been fully complied with, and hence the company was entitled to the possession of the notes, and had a legal right to negotiate them. The company being entitled to the notes pursuant to the terms of the subscription agreement, the breach was merely technical, not of substance. The law that contracts may not be rescinded for mere technical or unsubstantial breaches is well stated in 1 Black on Rescission, etc., at page 514, in the following words:

"But it is also a part of this rule that a contract may not be rescinded on account of a default or failure of performance in respect to a matter which is merely technical, or which is insignificant or of minor importance as respects the main objects of the contract."

There is, however, still a further answer to this contention, which is that the condition that the notes should be deposited with a trustee while contained in the first agreement dated August 20, 1920, was entirely omitted from the agreement dated and signed February 1, 1921, when the note sued on was signed. It is, however, contended that, although the condition was omitted from the last agreement, nevertheless, in view that the agreements must all be construed together, the last contract must be construed as though it too contained the condition. Such, however, is not the rule of construction. It is well settled that, where contracts cover substantially the same subject-matter, and reference is made in one to another respecting the same matter, such contracts will be construed together to the extent only that their terms are the same or substantially the same, or by reference are made the same. The rule is well stated in *Moreing v. Weber et al.,* 3 Cal. App. 14, 84 P. 220, where, in the course of the opinion, it is said:

"The rule seems so well established that it may be said to be elementary, that where, in a contract, reference is made to another writing for a particular specified purpose, such other writing becomes a part of the contract for such specified purpose only. * * *"

While the subscription agreements all refer to each other for specific purposes, it is nevertheless manifest that the condition to deposit the notes with a trustee was not one of such purposes, and that it must be assumed that the condition that the notes should be deposited with a trustee was intentionally omitted from the latter contract. The condition that the notes should be deposited with a trustee was therefore no longer in force when the note in suit was signed and delivered by the defendant. As already pointed out, however, in view of the undisputed facts, the breach, if it were held to be one, was merely technical and without substance. This contention must therefore likewise fail.

Nor is there any evidence to support the contention that the company, or any one in its behalf, was guilty of any fraud whatever in procuring the notes, and certainly not the note in question here. The testimony of defendant's own witnesses makes it quite plain that in obtaining the subscription for stock and the notes no fraud was either intended or practiced. True, the company did not operate a sugar factory. It, however, acquired one. It is also established beyond a reasonable doubt that the notes were signed and delivered to the company for the express purpose of obtaining funds to acquire a sugar factory. The effect of all the agreements is that the company should "acquire" or "procure" a sugar factory, not that it should build one. The notes were therefore executed and made negotiable for the very purpose that they should be negotiated to raise funds to procure or to acquire a sugar factory.

It is, however, also contended that at least many of the subscribers for stock if not all, were defrauded, in that a sugar factory was not erected or acquired in Salt Lake county as stated in the preamble of the subscription contracts. Here again the evidence coming from defendant's witnesses is clear and explicit that the company made full reports to the subscribers respecting

its intention to acquire a sugar factory in Weber county, namely the so-called Hooper plant. The record shows that a meeting of the subscribers was called and held at the Hotel Utah, where the whole matter of acquiring the Hooper plant in Weber county was discussed. It may be and no doubt is the fact that not all of the subscribers were present and participated in that meeting. The evidence of defendant's witness, an officer of the company, was, however, to the effect that all of the subscribers were duly notified of the meeting by notice deposited in the United States mail. At all events no objection was made to the proposal of the company to acquire the Hooper plant. There is therefore clear and explicit evidence in the record that, after full notice from the company of what it contemplated to do, and after giving the reasons why it contemplated doing so, no one objected, and the company then acquired the Hooper plant. Under the circumstances it is difficult to find anything in this record from which it can be inferred that the company or its officers did not act in good faith in doing what was done in acquiring the Hooper plant. True, the plant was never operated by the company, and thus many things that were contemplated failed of consummation. In this connection, however, it must be remembered that the scheme or plan to acquire a sugar factory on the co-operative plan was undertaken at the wrong time. The plan was conceived within a short time after the close of the World War, and when all enterprises, although long established, found it hard to maintain their credit and to keep going. That economical and financial conditions were then in a very unsettled state and that prices were continually falling and money scarce is a matter of common knowledge. It is also a matter of common knowledge that in those times any enterprise might fail without fraudulent purposes or mismanagement of its affairs. Considering the record as a whole the writer must confess his entire inability to discover anything from which fraud or bad faith on the part of the company or any of its officers can be inferred.

It is, however, also contended that the subscription contracts were breached in that no dumps or unloading places for beets were provided for the company. The undisputed facts in the record, however, are that the provisions of the contract, respecting that matter were executory merely, and were not to be performed until after the note in suit was transferred by the company to Woolley, and by him negotiated to the plaintiff. The transactions referred to occurred early in February, 1921, and long before dumps were required to be constructed for the beet crop of 1921. It is elementary that, where negotiable instruments are issued as parts of contracts, which contracts are executory, breaches of such contracts which occur after the instruments have been negotiated can have no effect upon the rights of one who acquires the instruments before due and without notice of such breaches. See *Karren v. Bair*, 63 Utah, 344, 225 P. 1094, and the cases there cited.

It is, however, also contended that the subscription agreement was breached by the company because no stock certificates were delivered to the suscribers. No demand was made for the stock certificates, and it has frequently been held that it is immaterial that stock certificates are not delivered or tendered. 14 C. J. at page 487, § 862. The reason for the rule is fully stated by the Court of Appeals of Kentucky in the case of *Preston v. Jeffers, Receiver*, 179 Ky. 387, 200 S. W. 654. This breach, if it may be so called, however, cannot affect the rights of the plaintiff as a holder in due course.

In view of what is said in the opinion of *National Bank of the Republic v. Price*, supra, the writer feels constrained to examine into the legal questions relating to purchasers of negotiable instruments somewhat extensively and to review the authorities with more than usual care. It is intimated in the Price Case, supra, that the president of plaintiff in acquiring the note there in suit failed to do certain things which he should have done in order to sustain the claim of a purchaser in good faith. For example:

It is said in the course of the opinion in the Price Case that the transaction between the president of the plaintiff bank and Mr. Woolley was out of the ordinary. The author of the opinion in that regard said:

"It was not an ordinary transaction to purchase such negotiable paper. Plaintiff was a national bank, and had no right to buy any negotiable paper except in the manner provided by law. It may discount negotiable promissory notes and other evidences of debt. 'This gives the power to acquire title thereto by purchase by way of discount, but in no other way.'"

In support of the foregoing statement 3 Michie, Banks and Banking, § 260, p. 2005, is cited. It is true that the statement in part at least is made in the volume referred to. Michie, however, cites as his authority *Rochester First Nat. Bank v. Pierson,* 24 Minn. 140, 31 Am. Rep. 341, decided in 1877, or nearly 50 years ago. No other case is cited by Michie. That case has, however, many times been overruled, and was not the law when it was cited by Michie. See 5 Fed. Sts. Ann. p. 83. In this connection it is further said in the volume just referred to, at page 84:

"The words 'by discounting and negotiating promissory notes, drafts, bills of exchange,' and so forth, are not to be read as limiting the mode of exercising 'such incidental powers as shall be necessary to carry on the business of banking,' but as descriptive of the kind of 'banking' which is authorized."

Some of the cases are there collated. In *Morris v. Third Nat. Bank,* 142 F. 25, 73 C. C. A. 211, it is held:

"The power to discount promissory notes and other evidences of debt, expressly given to national banks by Rev. St. sec. 5136 (U. S. Comp. St. 1901, p. 3455 [U. S. Comp. St. § 9661]) is sufficiently comprehensive to include the purchase of notes at less than their face value."

The right to exchange commercial paper is, however, well established, and where such exchange is made in good faith and in the regular course of business the parties are protected precisely the same as though they had purchased the

paper. See *Miller v. Marks,* 46 Utah, 257, 148 P. 412, and cases there cited. It seems to the writer that if the purchase of negotiable paper is protected the exchange thereof must necessarily also be protected.

In this transaction no doubt the plaintiff could have paid Mr. Woolley cash for the notes, and he in turn could have paid the plaintiff in cash for the notes he received. Such necessarily can always be done where notes are exchanged with a banking institution. It is also, however, intimated in the Price Case that full value was not paid by the bank for the notes, and that such fact militates against its claim as a holder in good faith. The evidence is undisputed that the face value of the notes received by plaintiff from Woolley amounted to $95,000, and that the notes of the Chesney Stock Farm that were given by plaintiff to Woolley were of the reasonable value of $100,000. It was, however, explained that the stock farm notes consisted of what is called slow or frozen paper, while the notes received from Woolley were considered better because they were in small amounts and were payable by farmers who were considered able to pay. Moreover, Woolley was desirous of acquiring the stock farm paper, while the plaintiff was desirous of disposing of it, for the reason that if it kept the paper it would perhaps have to advance more money to the stock farm, which plaintiff did not desire to do. In view of all the facts the writer is unable to conceive any reason why the transaction between Woolley and the plaintiff was not entirely legitimate and proper, although it may be one that does not occur daily in banking institutions. That, however, does not make it an illegitimate transaction. Some cases are, however, cited in the Price Case which it is contended support the views expressed upon the question that the failure to pay full value for the negotiable instruments may be considered as evidence of bad faith. The case of *Pierson v. Huntington,* 82 Vt. 482, 74 A. 88, 29 L. R. A. (N. S.) 695, 137 Am. St. Rep. 1029, is cited. While it is true that there are some remarks in the course of the opinion in

that case which lend color to the contention, it is, however, equally true that *Pierson v. Huntington* was no longer the law in Vermont when the Price Case was decided. Indeed, it is intimated in the opinion in *Pierson v. Huntington* that the weight of authority is not in accord with the statements contained in the opinion in that case. By what is just said we do not wish to be understood that a large discrepancy between the actual cash value of paper and the price paid therefor may not be considered open to question of good faith. What is meant is that a mere reasonable discount is not a factor to be considered. Moveover, *Pierson v. Huntington* was decided before the Negotiable Instruments Law was adopted in the state of Vermont. In a later case emanating from the Supreme Court of Vermont, *Howard Nat. Bank v. Wilson*, 96 Vt. 438, 120 A. 889, which was decided after the Negotiable Instruments Law had been adopted in that state, the prevailing rule is adopted and the former Vermont decisions which are contrary to the decision in the Howard Nat. Bank Case are overruled. The opinion in the Howard Nat. Bank Case goes into the subject very thoroughly, and in view that the great, the overwhelming weight, of authority is there reflected, we take the liberty of quoting somewhat freely from that case. It is there said:

"Prior to the Negotiable Instruments Act two distinct lines of cases had developed in this country. The first had its origin in *Gill v. Cubitt*, 3 B. & C. 466, 10 E. C. L. 215, where the rule was distinctly laid down by the Court of King's Bench that the purchaser of negotiable paper must exercise reasonable prudence and caution, and that if the circumstances were such as ought to have excited the suspicion of a prudent and careful man, and he made no inquiry, he did not stand in the legal position of a bona fide holder. The rule was adopted by the courts of this country generally, and seems to have become a fixed rule in the law of negotiable paper. Later in *Goodman v. Harvey*, 4 A. & E. 870, 31 E. C. L. 381, the English court abandoned its former position and adopted the rule that nothing short of actual bad faith or fraud in the purchaser would deprive him of the character of a bona fide purchaser and let in defenses existing between prior parties; that no circumstances of suspicion merely, or want of proper caution in the purchaser, would have this effect;

and that even gross negligence would have no effect, except as evidence tending to establish bad faith or fraud. Some of the American courts adhered to the earlier rule, while others followed the change inaugurated in *Goodman v. Harvey*. The question was before this court in *Roth v. Colvin*, 32 Vt. 125, and on full consideration of the question a rule was adopted in harmony with that announced in *Gill v. Cubitt*, which has been adhered to in subsequent cases, including those cited above. Stated briefly, one line of cases including our own, had adopted the test of the reasonably prudent man and the other that of actual good faith. It would seem that it was the intent of the Negotiable Instruments Act to harmonize this disagreement by adopting the latter test. That such is the view generally accepted by the courts appears from a recent review of the cases concerning what constitutes notice of defect. Brannan on Neg. Ins. Law, 187-201. To effectuate the general purpose of the act to make uniform the Negotiable Instruments Law of those states which should enact it, we are constrained to hold (contrary to the rule adopted in our former decisions) that negligence on the part of the plaintiff or suspicious circumstances sufficient to put a prudent man on inquiry, will not of themselves prevent a recovery, but are to be considered merely as evidence bearing on the question of bad faith. See G. L. 3113, 3172, where such a course is required in construing other uniform acts.

"It comes to this then: When the case has taken such shape that the plaintiff is called upon to prove himself a holder in due course to be entitled to recover, he is required to establish the conditions entitling him to standing as such, including good faith in taking the instrument. It devolves upon him to disclose the facts and circumstances attending the transfer, from which good or bad faith in the transaction may be inferred. The question is generally one of fact for the jury. There is this exception, however, where the evidence of the plaintiff's good faith is undisputed and is not only consistent therewith but is so conclusive that fair-minded men could draw no different inference, it is the duty of the court to decide the question as a matter of law and instruct the jury accordingly."

The intimation in the Price Case that the purchaser of negotiable paper is required to make and pursue certain inquiries and that the rule ordinarily applicable in equity that what might be ascertained by reasonable inquiry is the equivalent of knowledge is so well answered and exploded in a recent decision from the Supreme Court of New Mexico, namely, *First Nat. Bank of Albuquerque v. Stover*, 21 N. M. 453, 155 P. 905, L. R. A. 1916D, 1280, Ann. Cas.

1918B, 145, that I take the liberty of quoting the rule as it is there stated in the headnote as follows:

"The general principles, running throughout the whole law, that notice of facts which should put one upon inquiry and which, if followed up with diligence and understanding, would lead to the truth, has no application to the question of good faith in the taking of negotiable instruments. The question in such cases is, Did the holder have actual knowledge of the infirmity or defect or knowledge of such facts that his action in taking the instrument amounted to bad faith? Suspicious circumstances, negligence, or wilful ignorance may be evidence of bad faith from which the jury may find the fact. The holder, however, will be protected unless, at the time he took the paper, he had reason to believe, and did believe, there was some defect or infirmity in the paper. The facts in this case examined and held not to authorize a finding that the appellant bank did not take the note in good faith; three [there] being no substantial evidence to support any such finding."

In view that certain language is quoted from the old New York case of *Bank v. Diefendorf*, 123 N. Y. 191, 25 N. E. 402, 10 L. R. A. 676, in the Price opinion, it may not be out of place to examine into the status of that case in the state from which it emanates. The case is somewhat tersely discussed in *Rosenblum v. Blaser* (N. Y. Sup.) 115 N. Y. S. 219, where it is said:

"Omission to inquire about or communicate with Blaser or concerning the consideration moving to him, and the purchase of the notes for less than there face value, blazed an opening for Blazer's counsel to introduce pages and pages of testimony under cover of dicta in the opinion in *Bank of Canajoharie v. Diefendorf*, 123 N. Y. 191, 25 N. E. 402, 10 L. R. A. 676, written by a zealous judge, once a notable advocate, whose homily or piping phrases in 11 solid pages, upon a promissory note case, if taken literally, rather than regarded as bad law made by a hard case, would long since in this state have dwarfed dealings in negotiable instruments and put an end to the commercially useful and reputable business of note brokers."

See, also, *Bank v. Bank*, 53 App. Div. 635, 65 N. Y. S. 757, where the court refused to follow the Diefendorf Case. *Bank v. Diefendorf*, therefore, was not followed even by the New York courts.

The same may be said of *Arnd v. Aylesworth,* 136 Iowa, 297, 111 N. W. 407, upon which much reliance is placed in the Price Case. The Arnd Case is frequently referred to in the more recent Iowa cases, among others, *Robertson v. Stock Co.,* 164 Iowa, 230, 145 N. W. 535, *Connelly v. Greenfield Svgs. Bank,* 192 Iowa, 876, 185 N. W. 887, and especially in *First Nat. Bank v. Dutton* (1925), 199 *Iowa,* 468, 202 N. W. 229. A, mere cursory examination of the Iowa cases decided since the Arnd Case was decided will disclose that the Iowa Supreme Court refused to follow the Arnd Case to its logical conclusion.

The writer has devoted a great deal of time to ascertain the general trend of the decisions based upon the Negotiable Instruments Law with respect to when and against what a holder in due course is protected. In all of the following cases the doctrine stated in *Howard Nat. Bank v. Wilson,* 96 Vt. 438, 120 A. 889, and in *First Nat. Bank of Albuquerque v. Stover,* 21 N. M. 453, 155 P. 905, L. R. A. 1916D, 1280, Ann. Cas. 1918B, 145, is fully sustained: *Huntington R. M. & M. Co. v. Miller,* 60 Utah, 236, 208 P. 531; *Karren v. Bair,* supra; *Farmers' State Bank v. Brenneke,* 118 Kan. 251, 119 Kan. 508, 240 P. 397; *First Nat. Bank v. Gunning,* 127 Wash. 307, 220 P. 793; *State Bank v. Harford,* 116 Kan. 262, 226 P. 750; *Howard v. Reiter,* 120 Kan. 303, 243 P. 278; *Winter v. Nobs,* 19 Idaho, 18, 112 P. 525, Ann. Cas. 1912C, 302; *Butte Machinery Co. v. Jeppeson,* 41 Idaho, 642, 241 P. 36; *Oliver v. Garlick,* (C. C. A.) 2 F. (2d) 132; *Mack v. Dailey* (C. C. A.) 3 F. (2d) 534; *Orient State Bank v. Zemlicka,* (S. D.) 207 N. W. 69; *Jenkins v. Johnson,* 116 Okl. 17, 243 P. 178; *Omaha Steel Works v. Martin,* 78 Colo. 560, 243 P. 619; *Liberty Nat. Bank v. Kendall,* 113 Okl. 140, 240 P. 72; *Kincaid v. Estes,* 218 Mo. App. 109, 262 S. W. 399; *Reitherman v. Wheeler* (Mo. App.) 247 S. W. 222; *First Nat. Bank v. Dutton,* 199 Iowa, 468, 202 N. W. 228; *Goedhard v. Folstad,* 156 Minn. 453, 195 N. W. 281; *Bank of Jordan Valley v. Duncan,* 105 Or., 105, 209 P. 149; *Edelen v. First Nat. Bank,* 139 Md. 413, 115 A. 599; *Security State*

*Bank v. Merchants' State Bank* (Tex. Civ. App.) 275 S. W. 721.

We have cited only the more recent cases and all of those cited practically cover all the phases respecting defenses to commercial paper, and in many of them the verdict of a jury was set aside, and in some of them the lower court was directed to enter judgment for the plaintiff holder of the instrument upon the record presented to the appellate court.

This court in *Leavitt v. Thurston,* 38 Utah, 351, 113 P. 77, and in *Karren v. Bair,* 63 Utah, 344, 225 P. 1094, has also stated the rule as to when the verdict of a jury may be set aside in cases like the one at bar. This opinion is, however, already too long to permit òf reviewing all the cases cited, and we shall do no more than call attention to what is held in a few of them.

In *Omaha Steel Works v. Martin,* supra, the court held:

"Failure to direct verdict for transferee as holder in due course of notes given for stock subscriptions in a newly organized corporation held error, in view of absence establishing that plaintiff was not a holder in due course within C. L., § 3873."

In *Reitherman v. Wheeler,* supra, it is held:

"Mere suspicious facts, or facts that would put a reasonable man on inquiry, or negligence, are not sufficient to charge a purchaser of a note with notice of its infirmity; but actual knowledge of the facts concerning its execution must be brought home to him, or bad faith must be shown."

In *Goedhard v. Folstad,* supra, the court held:

"Clear, positive and undisputed testimony, not improbable or contradictory, given by unimpeached witnesses, cannot be rejected or disregarded unless the evidence discloses facts and circumstances which furnish a reasonable ground for doing so."

We have stated the facts very much more in detail than is ordinarily usual, and have quoted excerpts from the record to show the real trend of the evidence, and that there is not the slightest conflict. From the whole record it is clearly

apparent that we are here not dealing with an ordinary stock selling enterprise by a private corporation. The facts here are that the corporation was intended to aid the beet growing farmer to obtain better prices for his beets. The corporation was in fact to be a farmers' corporation and a sugar factory was to be acquired or to be operated for the mutual benefit of the beet growers and not for the benefit of the corporation merely. The notes were all executed and delivered with that end in view and for the purpose of obtaining the necessary funds to acquire a sugar factory to be operated for the purposes stated. The makers of the notes therefore fully understood and intended that their notes should be sold or negotiated. There can be no dispute upon that point. In view of the foregoing some individual or some organization had to take up the matter of disposing of the notes and of acquiring a sugar factory. The company was therefore organized for that purpose, and the record discloses that the officers of the company in what they did attempted to carry out the purposes that all of the interested parties had in view. The enterprise, however, resulted in a failure, and, as is usual in every failure when viewed retrospectively there is always much room for adverse criticism. Viewing the record as a whole, however, the writer is unable to deduce the inference and to arrive at the conclusion that counsel for defendant have arrived at. If it be assumed, however, that there are indications of fraud on the part of the officers of the company, where is there any evidence whatever that the president of the plaintiff bank had any notice or knowledge of such assumed fraud? Moreover, where is there the slightest evidence of bad faith on his part in acquiring paper that was executed and delivered for the very purpose of being negotiated to some one who would be willing to purchase it at its face value? If it be again assumed that there are some suspicious circumstances disclosed by the evidence, yet that is the most that can be claimed as against plaintiff's rights. All the authorities hereinbefore cited make it palpably clear that that is not

enough, even thought there were no explanation on the part of the holder of the note who obtained it before maturity and in due course. In this case the president of the bank, however, disclosed all of the facts relating to the purchase of the notes. All of his statements are reasonable and inherently probable, and no one disputes or questions them. Plaintiff's good faith in obtaining the notes, including the note in suit, is therefore clearly established without question or contradiction. There is therefore no basis for the verdict and judgment, and hence they cannot be permitted to stand.

From what has been said it follows that the decision in *National Bank of the Republic v. Price,* so far as it is in conflict with the overwhelming weight of authority as shown by the numerous cases hereinbefore referred to, and in so far as it is in conflict with the views herein expressed, should be, and it is hereby, disapproved and modified.

In order to avoid any misunderstanding, the writer feels impelled to add that by what has just been said respecting the modification of the decision in *National Bank of the Republic v. Price* he does not wish to be understood as holding or as intimating that upon the whole record presented in that case this court was not justified in arriving at the conclusion reached in that case, but what he wishes to impress upon the reader is that in that case a number of cases cited and relied on by the writer of the opinion are manifestly contrary to the great weight of authority, and that for that reason the conclusion based upon those cases should not be and is not approved.

The judgment is reversed and the cause remanded to the district court, with directions to grant a new trial and to proceed with the case in accordance with the views herein expressed. Appellant to recover costs.

GIDEON, C. J., THURMAN and CHERRY, JJ., and BARKER, District Judge, concur.

STRAUP, J., being disqualified, did not participate herein.